EDMUND P. GAINES AND WIFE v. BEVERLY CHEW, RICHARD RELF, AND OTHERS.

It is impossible to lay down any general rule as to what constitutes multifariousness in a bill in equity. Every case must be governed by its own circumstances, and the court must exercise a sound discretion.

A bill filed against the executors of an estate and all those who purchased from them, is not, upon that account alone, multifarious.

Under the Louisiana law, the Court of Probate has exclusive jurisdiction in the proof of wills; which includes those disposing of real as well as personal estate.

In England, equity will not set aside a will for fraud and imposition, relief being obtainable in other courts.

Although by the general law, as well as the local law of Louisiana, a will must be proved before a title can be set up under it, yet a court of equity can so far exercise jurisdiction as to compel defendants to answer, touching a will alleged to be spoliated. And it is a matter for grave consideration, whether it cannot go further and set up the lost will.

Where the heir at law assails the validity of the will, by bringing his action against the devisee or legatee who sets up the will as his title, the District Courts of Louisiana are the proper tribunals, and the powers of a Court of Chancery are necessary, in order to discover frauds which are within the knowledge of the defendants.

Express trusts are abolished in Louisiana by the law of that state, but that implied trust, which is the creature of equity, has not been abrogated.

The exercise of chancery jurisdiction by the Circuit Court of the United States, sitting in Louisiana, does not introduce any new or foreign principle. It is only a change of the mode of redressing wrongs and protecting rights.

THIS case was a sequel to that which came before the court twice before, and is reported in 13 Peters, 404, and 15 Peters, 9.

It came up again from the Circuit Court of the United States for the eastern district of Louisiana, sitting as a court of equity, on a certificate of a division of opinion in that court, upon the three following questions:

1. Is the bill multifarious? and have the complainants a right to sue the defendants jointly in this case?

2. Can the court entertain jurisdiction of this case without probate of the will set up by the complainants, and which they charge to have been destroyed or suppressed?

3. Has the court jurisdiction of this case? or does it belong exclusively to a court of law.

The case was this, as set forth by the complainant; the defendant not yet having answered the bill.

It is stated with some particularity, because the counsel for the complainants dwelt strongly upon the injustice that would follow if such a case (supposed in the argument to be admitted by the demurrer) should prove remediless in a court of chancery. It is proper to refer to the report of the argument of the counsel for the defendants, in which he affirmed that the important facts alleged to exist by the complainant would be denied and disproved, if the court should be of opinion that the cause should go on. Some of the circumstances mentioned came out upon cross-examination.

In the year 1796, there was a French family by the name of Carriere, residing in New Orleans. One of the daughters was named Zuline, and about sixteen years of age. A person by the name of De Grange, came there and married her; they continued to live together for several years, until about the year 1800, when it was reported that De Grange had another wife living. A separation took place between him and Zuline. In 1802, she went to New York (where it was said De Grange's former marriage had been celebrated) to obtain proof of it; but the registry of marriages having been destroyed, the proof was not obtained. She then went to Philadelphia, where Mr. Gardette was living, who was one of the witnesses of the prior marriage, and confirmed it. Whilst she was there, she had a daughter, to whom the name of Caroline was given; and who is the same person spoken of in the proceedings in this suit, by the name of Caroline Barnes. Clark treated her as his child, and afterwards placed her to live with his mother.

In 1803, De Grange's first wife came from France to New Orleans; and he, being there also, was seized and prosecuted for bigamy. He was arrested and thrown into prison, but effected his escape, and never afterwards returned. Clark was married to Zuline in Philadelphia, in the same year, but required the marriage to be kept secret

Gaines et ux. v. Chew et al.

until judicial proof could be obtained of the nullity of her marriage with De Grange.

In 1805, Clark having returned to New Orleans and established Zuline in a separate establishment from his own, the commercial firm of Davis and Harper was formed, and rested almost entirely upon the credit furnished by Clark. In 1806, Zuline was about to give birth to another child, and, at the instance of Clark, arrangements were made by Davis for its being received into his (Davis's) family. It proved to be a daughter, and was called Myra. She was suckled by Mrs. Harper, who put out an infant of he own to enable her to do so. Clark treated her as his daughter, furnished her with expensive clothing and playthings, and purchased a servant for her use.

Shortly afterwards, Clark became a member of Congress, and was absent from New Orleans for a considerable length of time. During his absence, a report reached New Orleans, that he was about to contract a marriage at the north, and Zuline, whose feelings were fretted and irritated by his refusal to promulgate their marriage, sailed for Philadelphia, to obtain the legal proofs of her own marriage. When she arrived there, she was told that the priest who had performed the ceremony, was gone to Ireland. Being informed by counsel, whom she consulted, that she would not be able to establish the validity of her marriage, she determined to have no further communication with Mr. Clark, and soon afterwards married Mr. Gardette, of Philadelphia.

Clark returned to New Orleans. In 1811, being about to visit Philadelphia on a special emergency, he made a provisional will, as follows:

Daniel Clark. In the name of God: I, Daniel Clark, of New Orleans, do make this my last will and testament.

*In primis.* I order that all my just debts be paid.

Second. I leave and bequeath unto my mother, Mary Clark, now of Germantown, in the state of Pennsylvania, all the estate, whether real or personal, which I may die possessed of.

Third. I hereby nominate my friend, Richard Relf and Beverly Chew, my executors, with power to settle every thing relating to my estate.

*Ne varietur.* New Orleans, 20th May, 1811.

  Signed          J. Pitot, *Judge.*

               Daniel Clark.

About the time of executing this will, he conveyed to Joseph Belle-chasse about fifty lots in the city of New Orleans, in the suburbs or fauxbourg St. John's, near the bayou of that name, in fee-simple, with the confidential understanding that they were to remain under his control for the use and benefit of his daughter Myra.

On the 27th of May, 1811, Clark, being so far upon his voyage, wrote to his friend Mr. Davis, the following letter.

Dear Sir:—We are preparing to put to sea, and I hope I shall have a pleasant passage, my stay will be but short in Philadelphia, unless a forced one. In case of any misfortune to me, be pleased to deliver the enclosed to General Hampton; I count on him as a man of honour to pay the amount of notes mentioned in my letter to him, which in that case you will dispose of as I have directed. It will naturally strike you that the letter to the general is to be delivered only in case of misfortune to me, remember me kindly to Mrs. Davis and all your family.                           Yours,
    Signed                           DANIEL CLARK.

P. S. Of the enclosed letter you will say          unless in case of accident, when you may communicate it to Chew and Relf.

S. B. Davis.

The direction alluded to in the above, was to place the amount of the notes to the best advantage for his daughter Myra's interest. Having arrived safely at Philadelphia and remained there until July, he addressed the following letter to Mr. Davis, on the eve of his sailing for New Orleans, on his return.

*Philadelphia, 12th July, 1811.*

My dear Sir:—In case of any accident or misfortune to me, be pleased to open the letter addressed to me, which accompanies this, and act with respect to the enclosures as I directed you with respect to the other affairs committed to your charge before leaving New Orleans. To account in a satisfactory manner to the person committed to your honour, will, I flatter myself, be done by you when she is able to manage her own affairs; until when, I commit her under God to your protection. I expect to sail to-morrow for New Orleans in the ship Ohio, and do not wish to risk these papers at sea.
    Yours,
    Signed          DANIEL CLARK.

S. B. Davis. Esq.

Upon Clark's safe arrival in New Orleans, Davis returned to him the package enclosed in the above letter, and also the letter addressed to General Hampton in the letter which he had written from the Balize.

Upon Clark's return, Bellechasse also offered to reconvey the lots, which Clark declined, and Bellechasse continued to hold them until Clark's death, when he conveyed them in equal portions to Myra and Caroline, being influenced to include the latter by the representations of some of Clark's friends.

In 1812, Davis removed to the north with his family, carrying with him Myra, who passed for his daughter, and bore his name. He had then in his hands funds of Clark to the amount of $2,360, the interest of which, by arrangement between them, was to be applied towards her education.

In 1813, Clark died. It was alleged, that before his death he made an olographic will, leaving the bulk of his fortune to his daughter Myra. The circumstances under which he is represented to have made it, are thus detailed by some of the witnesses.

Dusuau de la Croix says, "that he was very intimate with the late Daniel Clark for a great many years, and up to the time of his death; that some few months previous to the death of Daniel Clark, he visited deponent on his plantation, and expressed a wish that he, deponent, should become his executor; deponent at first refused, but after a little, from the persuasion of said Clark, he consented to become his executor; that in this conversation, Clark spoke of a young female then in the family of Captain Davis, named Myra, that said Clark expressed a wish that deponent should become tutor to this female, and that she should be sent to France for her education, and that Mr. Clark would leave her a sufficient fortune to do away with the stain of her birth; that a month or two after this conversation at the plantation of deponent, he, deponent, called to see Clark at his house on the Bayou road, he there found him in his cabinet, and had just sealed up a packet, the superscription of which was as follows: 'pour etre ouvert en cas de mort.' Clark threw it down in the presence of deponent, and told him that it contained his last will and some other papers which would be of service; deponent did not see the will, nor does he know any thing about its contents, he only saw the packet with the superscription on it as before related."

Bellechasse says: "A very short time before the sickness that ended in his death, he, Clark, conversed with us about his said daughter Myra in the paternal and affectionate terms as theretofore. He told us that he had completed and finished his last will. He, Clark, therefore, took from a small black case his said last will, and gave it open to me and Judge Pitot to look at and examine. It was wholly written in the handwriting of said Daniel Clark, and it was dated and signed by the said Clark in his own handwriting. Pitot, de la Croix, and myself were the executors named in it, and in it the said Myra was declared to be his legitimate daughter, and the heiress of all his estate. Some short time afterwards I called to see him, Clark, and learned from said Relf that the said Clark was sick in bed, too sick to be seen by me; however I, indignant at an attempt to prevent me from seeing my friend, pressed forward into his room. He, said Clark, took him by the hand, and with affectionate reprehension said, 'How is it, Bellechasse, that you have not come to see me before since my sickness? I told Relf to send for you.' My answer was, that I had received no such message or account whatever of his sickness from Relf. I said further, 'My friend, you know that on various occasions I have been your physician, and on this occasion I wish to be so again.' He looked at me and squeezed my hand. Fearful of oppressing him, I retired, and told Relf that I would remain to attend occasionally to Clark. Relf said there was no occasion for it, that the doctor or doctors had ordered that he, Clark, should be kept as quiet as possible, and not be allowed to talk. I expressed apprehension for the situation of Clark, but Relf expressed a different opinion; and on his, Relf, promising to send for me if there should appear to be any danger, I departed. On the next day, without receiving any message from Relf, I went and found Clark dead."

Mrs. Harper (afterwards Mrs. Smyth) says: "In 1813, some few months before Mr. Clark's death, he told me he felt he ought no longer to defer securing his estate to his daughter Myra by a last will.

"Near this period, he stopped one day at my house, and said to me he was on his way to the plantation of Chevalier de la Croix, for the purpose of requesting him to be named in his will one of his executors, and tutor to his daughter Myra. On his return, he told me with much apparent gratification that De la Croix had consented to serve, and that Judge Pitot and Col. Bellechasse had consented to

be the other executors. About this time he told me he had commenced making his last will. Between this period and the time he brought his last will to my house, Mr. Clark spoke very often of being engaged in making his last will; he always spoke of it in connection with his only and beloved daughter Myra; said he was making it for her sake, to make her his sole heiress, and to insure her being educated according to his wishes. At the times Mr. Clark spoke of being engaged in making his last will, he told me over and over again, what would constitute its contents; that he should in it acknowledge the said Myra as his legitimate daughter, and bequeath all his estate to her, but direct that an annuity of $2000 a year should be paid his mother during her life, and an annuity of $500 a year to a young female at the north of the United States, named Caroline De Grange, till her majority; then it was to cease, and $5000 dollars were to be paid her as a legacy, and that he would direct that one year after the settlement of his estate $5000 should be paid to a son of Judge Pitot, of New Orleans, as a legacy; at the same period $5000 as a legacy to a son of Mr. Du Buys, of New Orleans; that his slave Lubin was to be freed, and a maintenance provided for him. In his conversations respecting his being engaged in making his last will, he talked a good deal about the plan of education to be laid down in his will for his daughter Myra; he expressed frequently his satisfaction that the Chevalier de la Croix would be the tutor in his will; he often spoke with earnestness of the moral benefit to his daughter Myra from being acknowledged by him in his last will as his legitimate daughter, and he often spoke of the happiness it would give his mother; he expressed the most extravagant pride and ambition for her, he would frequently use the emphatic language, that he was making her a bill of rights; he mentioned at these times, that this would contain a complete inventory of all his estate, and explanations of all his business, so as both to render the administration on his estate plain and easy to his friends, Chevalier de la Croix, Judge Pitot, and Col. Bellechasse, and as a safeguard to his estate, in case he should not live long enough to dissolve and adjust all his pecuniary relations with others. About four weeks before his death, Mr. Clark brought this will to my house; as he came in, he said, 'Now my will is finished,' my estate is secured to Myra beyond human contingency, 'now if I die to-morrow, she will go forth to society, to my relations, to my mother, acknowledged by

me, in my last will, as my legitimate daughter, and will be educated according to my minutest wishes, under the superintendence of the Chevalier de la Croix, and her interests will be under the care of Chevalier de la Croix, Judge Pitot, and Col. Bellechasse; here is the charter of her rights, it is now completely finished, and I have brought it to you to read;' he left it in my possession until the next day, I read it deliberately from beginning to end.   In this will, Mr. Clark acknowledged Myra Clark as his legitimate daughter and only heir, designating her as then living in the family of S. B. Davis; Mr. Clark in this will bequeathed all his estate to the said Myra, but directed that an annuity of $2000 should be paid to his mother during her (his mother's) life, and an annuity of $500 should be paid to Caroline De Grange, till she arrived at majority, when the annuity was to cease, and $5000 were to be paid her as a legacy.   He directed that one year after his estate was settled, $5000 should be paid as a legacy to a son of Judge Pitot, of New Orleans; and that one year after his estate was settled $5000 should be paid as a legacy to a son of Mr. Du Buys, of New Orleans; he provided for the freedom and maintenance of his slave Lubin; he appointed Mr. Dusuau de la Croix tutor to his daughter Myra; he gave very extensive instructions in regard to her education; this will contained an inventory of his estate, and explanations of his business relations; he appointed Mr. Dusuau de la Croix, James Pitot, and D. D. Bellechasse, executors; the whole of this will was in Mr. Clark's handwriting; it was dated in July, 1813, and was signed by him; it was an olographic will; it was dated in July, 1813, and was signed by him; I was well acquainted with said Clark's handwriting.   The last time Mr. Clark spoke to me about his daughter and his last will, was on the day he came out for the last time (as far as I know) from his house, which was the last time I saw him; he came to my house at noon, complained of feeling unwell, asked leave to have prepared for him a bowl of tea; he made his visit of about two hours' duration, talking the whole time of his daughter Myra, and his last will; he said a burden of solicitude was removed from his mind from the time he had secured to her his estate beyond accident, by finishing his last will; he dwelt upon the moral benefit to her in society from being acknowledged by him in his last will as his legitimate daughter; he talked about her education, said it would be the greatest boon from his God to live to bring her up, but what was next to

that were his comprehensive instructions in his will in regard to her education, and her being committed to the care of the Chevalier de la Croix, who would be a parent to her.

After Clark's death, the will of 1811 was presented to the Court of Probate, and proved; letters testamentary were issued to the executors; a power of attorney was given to them by Mr. Clark's mother, and various pieces of property were sold under it and under the will.

In 1832, Myra married William Wallace Whitney, and about the time of her marriage became acquainted with her true name and parentage; and in 1836 filed a joint bill, with her husband, in the Circuit Court of the United States for the district of Louisiana against Relf and Chew, the executors in the will of 1811, the heirs of Mary Clark, and all the purchasers and occupants of the estate of which Clark died in possession, claiming to be the heir and devisee of Clark, and calling upon them all to account for the rents and profits of the several portions of the estate. The bill charged that the will of 1813 was fraudulently suppressed, that its existence and suppression were notorious, and that all the purchasers did, in their consciences, believe that the will of 1811 had been fraudulently admitted to probate. In addition to the prayer for an account, it prayed for general relief.

In the progress of the suit, Whitney having died, Edmund P. Gaines, sometime afterwards, married the widow and became a party to the suit.

The defendants all demurred, but filed separate demurrers. Barnes and wife demurred upon six grounds:

1. The want of equity in the bill.

2. That there existed a complete remedy at law.

3. Multifariousness and misjoinder.

4. That the will of 1813 was not probated.

5. That forced heirship gave title to but one-third, which was recoverable at law.

6. That the New Orleans and Carrollton Rail-road Company, with whom they were conjoined, was not shown to be a corporation.

Chew and Relf demurred generally, and also pleaded to the jurisdiction of the court.

Upon the argument of the demurrers, the three questions arose which are mentioned at the commencement of this statement, and

upon which the court were divided. These questions were the subject for consideration by this court.

*Henderson, Coxe,* and *Barton* (leave having been obtained for three counsel to address the court on the same side) for the defendants below, who had demurred.

*R. Johnson* and *Jones,* for Gaines and wife.

*Henderson.*

As to the 1st point. Is the bill multifarious? If the interests of the defendants are distinct, it is unlawful to make them join in the defence.

[The counsel here examined their relative interests.]

2. Can the court entertain jurisdiction without a probate of the will?

Some of the parties are aliens, living in England and Ireland. How can they be brought into court? Yet they must be, because they are all interested in the will of 1811. The equity power of this court is limited by the Constitution and Judiciary act to the usual powers of the English chancery; but it cannot possess all those powers, because our institutions are different. If the chancery power of England could not reach a state court, this cannot. Its powers must be uniform. If a state strips its courts of jurisdiction over mortgages, for example, this court must part with the power too. 4 Wheat., 115, 180.

Local laws cannot confer jurisdiction on the courts of the United States. 11 Peters, 184. The states may prescribe rules of proceeding, but not jurisdiction. 9 Peters, 632; 13 Peters, 259. The powers of this court cannot exceed or even come up to those of the English chancery. In England there is a distinction in chancery between real and personal property. It will entertain a bill to establish a will, when repeated decisions have been made about it, which is called a bill of peace. But the chancellor does not decide a will without referring it to a jury. This is the measure of the power of this court; it cannot go further. But can it go this far? The probate courts of Louisiana have the exclusive power of establishing wills as to personal property. Why not real also? In England the probate courts have not the power, and, therefore, the chancellor comes in. The decision of a probate court is final as to

real as well as personal estate. 2 Vernon, 9, 76, 441; 2 Atkyns, 324, 334.

The court cannot set aside a will by decree. In this case, the court must clash with the Probate Court, because it must revoke the probate of the will of 1811, before that of 1813 can be established. The prayer of the bill here is to carry into effect the will of 1813, to do which, this court must first take probate of it, and then execute its provisions. No case in the books goes as far as this.

While a probate stands, it is not examinable in chancery. 2 Vernon, 9.

Where personal estate is concerned, chancery declines to interfere. 2 Vernon, 76, 441.

A probate is conclusive until repealed. 1 Strange, 670, 673, 408; 1 Lord Ray. 262, 3 T. R. 129; 4 T. R. 159.

That jurisdiction over wills belongs exclusively to those courts which represent the ecclesiastical courts of England. See 12 Wheat. 375; 9 Peters, 176; 2 Harris and Gill, 49, 51; 3 Devereux, 341; 1 Nott and McCord, 327; 3 Leigh, 817, 819, 32; 3 Davy's Rep. 326; 3 Littell, 275; 1 Story's Rep. 525, 503; 3 Missouri Rep. 245; 6 Miss. Rep. 177; Walker's Rep. 323; 2 Howard Miss. Rep. 351; 1 Louis. Rep. 51; 2 Louis. Rep. 250; 5 Louis. Rep. 393; 10 Louis. Rep. 595; 10 Wheat. 469; 12 Wheat. 153.

In Louisiana, under their state law, courts of probate have exclusive jurisdiction over wills. Civil Code, sect. 1637, 1650; Code of Practice in civil cases, pages 924, 928, 936, 937.

The bill charges that the will of 1813 is suppressed or destroyed. If it is suppressed, there is power in those courts to reach it. Code of Practice, &c., 604, 607, 608, 609, 611.

The power of chancery in England extends to cases of spoliation of papers, but not to setting up a will of personalty. 1 Williams's Executors, 209.

To the same point, see 1 Fillmore's Reports, 153, 154; 4 Bibb, 553; 3 Porter, 53; 4 Missouri Rep. 210, 211.

It is the duty of the court to set up and establish lost wills. Civil Code of Louisiana, 2248.

Spoliation of papers does not include a lost will of personal property. 3 Atkyns, 360; 2 P. Wms. 748; 1 P. Wms. 723, 726.

This bill claims to set up a will of both real and personal estate.

3 G 2

*Coxe,* on the same side.

The bill is unskilfully prepared. When demurred to, such a bill is often decided upon grounds which do not appear in the record. There are two grounds in this case.

1. The jurisdiction of the court.

2. The multifariousness of the bill.

Myra claims to be the legitimate daughter and heir of Clark, and also under a will of 1813; and the bill is filed not only against the executors, but every one who is in possession of any part of the estate. But there is no allegation in the bill that any part of the real estate passed to the holders under the will of 1811. It is said that Clark died seised; but is silent whether this property was assets in the hands of the executors or not. It alleges that the executors conveyed the land, under a power of attorney, from Clark's mother. If the bill be true, then the possessors are merely tort-feisors, and this is not the remedy against them. All the English cases are those of devisees against heirs—the heir-at-law has a remedy at law. But the complainant here is under peculiar difficulties on account of state legislation. The tendency in this country is to assimilate real with personal property, and in ten states, courts of probate have jurisdiction over both species. These states have power over real estate, and over the jurisdiction of their courts. In Louisiana all trusts are abrogated. A *cestui que trust* cannot set up a title. Can this court say that any one shall hold land in trust there? Suppose that a devise of real estate were forbidden; could this court recognise it? In Louisiana, a probate is essential, and the courts which have charge of it have the same jurisdiction as a Court of Chancery in England. This court can neither revoke nor set up a will. If an executor sell property under a proved will, the title of the purchaser cannot be impeached, although the will be afterwards set aside for fraud. How can the Circuit Court in Louisiana revoke a proved will, when the English Court of Chancery will not? If the Court of Probate compels the executors to go on, the Circuit Court cannot grant an injunction to stop a state court from proceeding. The decree would therefore be impotent. Chancery will act upon the person, and compel the surrender of a paper, or the entry of satisfaction upon a fraudulent judgment; but in this case it would have to act upon a court.

The bill also prays that the declarations of Clark as to the legiti-

macy of the complainant may be established. Under what branch of power is this, and how can the court examine such a point? It also prays that all the sales made by the executors may be set aside. But if any of these were made by order of a court, can they be set aside also?

*R. Johnson*, for Gaines and wife, complainants.

Is the bill multifarious? The demurrer admits the heirship, the will of 1813, the charge that it was placed in the hands of two of the defendants, that they fraudulently destroyed it, and set up the will of 1811; admits also that the existence of the will of 1813 was notorious, and the heirship of the complainant equally so. The argument admits all this, and asks the court to turn away the complainant, because parties are made defendants who ought not to be. The rule is within the sound discretion of the court, and designed to protect the innocent. But if the facts alleged in the bill be true, (and the argument admits them,) it will be here made the means of shielding the guilty. In this case, we need not invoke the discretion of the court, because, according to the authorities, the bill is not multifarious either as to the interests involved, or the parties.

The complainant claims as heir and devisee of the whole estate, and the object is, to have the title to the whole decreed to be valid. The parties are the original parties to the fraud and their confederates, taking with notice of the fraud. The defendants all deny the title of the complainant, and have, therefore, a common object. The rule of chancery is that multiplicity of litigation is to be avoided; but if we were to establish the will in a suit against one, it would be good only as to that one, and each of the defendants would have to be separately sued. This is not the spirit of the rule. Whoever has an interest to be bound, must be made a party. Milford's Pleading, 181, 182; 1 Atkyns, 282; 1 Mylne and Craig, 603, 616.

In Mylne and Craig it was said to be impossible to lay down an abstract proposition, as to what should constitute multifariousness. See also, 3 Price, 164; 2 Peters, 417; 4 Peters, 190.

If it be said that our remedy is at law, it is admitting that we have a case. But equity will maintain a concurrent jurisdiction where there is fraud, because it can sift the conscience and compel the delivery of papers. If there is a fraudulent deed, equity strikes it down, never to rise again. If we had gone to law and recovered the estate, complete justice would not have been done, because the will of 1811

would have remained standing to defraud the living and injure the memory of the dead. Full and final relief is only to be had in chancery.

If we had a probate of the will of 1813, it is admitted that we could be relieved, and the question is, whether chancery, in England, could relieve without going through the forms of probate. Suppose the court in Louisiana has exclusive jurisdiction of probates, still the question is, whether the bill shows a case proper for the Circuit Court. The demurrer admits that the will of 1813 has disappeared by the fraudulent conduct of the defendants, or that it remains in their possession and they refuse to produce it. Is there nothing here upon which the chancery power of this court can act? The Probate Court of Louisiana has no power commensurate with the case. Its jurisdiction is given by statute. What is it?

It can take probate of wills in the manner directed, but the case of a suppressed will is not provided for.

The power is contained in Code of Practice, art. 924; but 925 says, it has no jurisdiction except in cases enumerated in the preceding article. There is authority given to open, receive, and record a will, but none to bring it out when suppressed. See articles 928, 930, 931, 933, 935, 936, 937. By 937, if the notary or other person refuse to produce it, he shall be arrested, and if he can give no good reason, shall be committed to prison and respond in damages. But a remedy in damages is utterly insufficient in this case. We want the land and property. It is said that a copy can be evidence; but the civil court only makes evidence copies of such papers as are already recorded. The question before the court is, whether we can get on without a probate, which we cannot obtain; for the demurrer admits that the will is either suppressed or destroyed. We want the only evidence which will enable us to obtain relief; the probate of the will of 1811 would be no obstacle. It must be shown, by the other side, that jurisdiction over the case is vested exclusively in some other court. But in England the case of a spoliated will falls within chancery powers. Lord Hardwicke said, in the case cited from 3 Atkyns, that he would, in such a case, hold an executor trustee for the devisee. 3 Atkyns, 359

The other cases are, 1 Chan. Rep. 13, 66; 1 Vernon, 296; Prec. in Chan. 3, 123; 1 P. Wms. 287, 731; 2 Vernon, 700; 1 Bro. Par. Ca. 250; 3 Bro. Par. Ca. 550.

These cases establish two propositions,  ·

1. That a probate in England, obtained by fraud, will be relieved against in chancery.

2. That a probate for personalty and realty, obtained by fraud, will make the party a trustee for the person interested, leaving the probate to stand, provided the fraud be perpetrated by spoliation or · destruction of papers.

The only two exceptions are, where part of the will is fraudulent and part not, and where there is a fraudulent agreement between the heir and devisee.   But if spoliation be proved upon the person who sets up the will, chancery will interfere.

The Constitution of the United States, and the Judiciary act of 1789, and the Process act of 1792, give to the federal courts, jurisdiction in all cases of law or equity.   All that we have to do is to show that this is a case of equity.

Constitution of the United States, art. 3, sec. 2; Judiciary act, sec. 11; it is a matter of right for all persons who have a case of equity to go into the courts of the United States and ask relief, 4 Wheat. 108; 3 Peters, 433; 3 Wheat. 212; 9 Peters, 655; 13 Peters, 358; 15 Peters, 9, 13.   In the last case the same objection was made that has now been made, but the court decided against it.

It is asked how we are to reach the Court of Probate.   The answer is found in the Constitution of the United States.   If it is a case, &c., all state power falls.   It was intended to protect the people from state prejudice; the framers of the instrument knew that local prejudices would exist, and saved the people from their operation.   Another answer is, that the Chancery Court acts upon persons, passing by state tribunals.   If they interfere, the twenty-fifth section of the Judiciary act meets the case.

It is objected that our argument destroys all state regulations, but this begs the question.   We say that Louisiana has recognised the right to transfer property by will, and this right was exercised in the present case.   Besides, state power cannot limit the Constitution of the United States and the jurisdiction of this court under it.   The bill was filed in 1836.   It took the defendants five years to find out that the bill did not make a case, and to file their demurrer.

*Jones* on the same side.

The first objection on the other side is, that the confederates are
    Vol. II.—80.

not charged to have derived their titles from the will. The printed abstract does not say so, it is true, but the record itself does. The bill charges, that they claim under colour of title from pretended executors, referring directly to the will.

The next objection is on account of the aliens, living in England and Ireland. But we have done all that we can as regards them. The court cannot lose jurisdiction because some of the parties reside abroad.

Is the bill multifarious?

It is the nature of equity to bring in all parties who have an interest. It is said in the books that claims must not be joined together when they are different, nor parties who have not an entire interest. But it is esteemed a virtue in equity that all proper parties are brought in. Thus in the case of a fishery; all came in, although their rights were separate. A demurrer will not hold, if the plaintiff claims under a general right. Mitford's Pleading, 181, 182.

If we were to sue separately, we should have to prove the same thing in every case, and a multiplicity of action is not favoured by equity.

As to the jurisdiction of the court.

It is said that a state court here claims exclusive jurisdiction. If a state can say that its courts shall have exclusive jurisdiction, it can, by extending the range of subjects, shut out the courts of the United States from all jurisdiction whatever. The only question is, is it a case of equity? If so, no matter how far the claim of exclusiveness of jurisdiction in the state courts may be pressed, the Constitution of the United States comes in with paramount authority. The opposite counsel have confounded the two questions of the exclusiveness of state jurisdiction and the conclusiveness of a final judgment of a court of competent jurisdiction. We agree that the judgment of such a court is conclusive upon all co-ordinate courts, until regularly reversed by an appellate court. But here we do not impeach any such judgment. By the law of Louisiana, a will of real estate has the same effect that a will of personalty has in England. We admit this. And we admit, too, that a probate is necessary to vest a title to real estate, as much so as recording a deed is, to give it validity. If our claim would be good against a proved will in England, it is good here. The Code of Louisiana is made up of the civil law and Napoleon Code. But what power has a probate court to prove a will which is not produced. They cannot set it up and admit it as a

factum. Civil Code, 1537, 1560; Code of Practice, 924; 3 Martin, 144; 12 Martin, 63; 5 Martin, N. S. 184; 3 Louis. Rep. 99; 6 Har. and Johns. 67.

The case in 11 Louisiana Rep. 593, is thought by the other side, to sustain the position that the Court of Probate could prove a will although it was not produced; but the case does not say so.

But it is argued that the will of 1811 must be set aside before that of 1813 can be set up, and that the Circuit Court cannot do this. Why not? It has as much right to do it as the Probate Court; not as an appellate tribunal, reviewing the decision of that court, but in the exercise of a separate jurisdiction. The will of 1811 may stand among the records, but its effect will be destroyed. So it is in England with spoliated deeds. Equity constantly sets aside law instruments when an equitable title is asserted.

What other remedy have we? We cannot go to the Probate Court and ask them to set up the will of 1813. They cannot do it. And even if they could, that would not debar us of this remedy. Code of Practice, 604 to 613; 3 Martin, 518; 5 Louis. Rep. 393.

If a state court had jurisdiction and the remedy is imperfect, a party must not be driven there. The Probate Court is shackled, and limited to matters of administration. It may compel an administrator to settle, but cannot direct a suit against third persons; and cannot give us the property in dispute. 1 Louis. Rep. 183; 3 Louis. Rep. 520.

It is said that a probate court is the only tribunal that can set aside a will. But we deny this. 10 Martin, 1; 1 Martin, N. S. 577; 3 Martin, N. S. 473; 5 Martin, N. S. 10, 217; 1 Louis. Rep. 215; 6 Martin, N. S. 305.

As to equity jurisdiction. It is a general principle that courts of equity have jurisdiction over all cases of fraud. Although courts of law have it, equity does not lose it. There are two exceptions recognised in the books, but neither of them includes this case. Generally, the heir need not go into chancery, because the title is cast upon him by descent; but where there is a devisee who thus appears to have the legal title, the heir cannot resort to a court of law, but must apply to equity. 13 Price, 721.

*Barton*, for the defendants, being demurrents, in reply and conclusion.

The facts in the case, although nominally admitted by the demur-

rer for the sake of argument, are not in reality admitted. Some of
the worthiest citizens of Louisiana are denounced in the bill, as per-
petrating atrocious frauds. If this court shall require them to answer
the bill, they will deny all the important facts charged in it. Thirty
years have elapsed since the transactions took place; and at the last
term, this court refused to open a case after twenty years had expired.
This is called a bill of peace. It is not like one. The heirs of Mary
Clark sold the land and received the money thirty years ago; and
yet those heirs are not made parties so that a cross-bill could be filed
against them.

[Mr. *Barton* here referred to a high opinion of Clark which had
been expressed in the course of the argument, in which he concurred.]

The will of 1811 gave the whole estate to his mother. Where
was his wife, if he had one?

So the will of 1813 is said to have given his wife nothing, in vio-
lation of all duties. The bill itself, therefore, attacks his character.
It says also that the complainant was kept in ignorance of her true
name until she was nineteen years of age. Her own mother is alleged
not to have told her, and yet this mother is said to have been the
wife of Clark.

Is the bill multifarious?

Story's Equity Pleadings, sect. 271 to 279, has numerous refer-
ences on this point. See also 1 Jacob, 151; 1 Maddock's Rep. 86;
2 Maddock's Rep. 294; 6 Maddock's Rep. 94; 18 Ves. 50; 2 Ves.
486; 2 Mass. Rep. 181; Littell's Select Cases, 320; 2 Bibb, 314;
4 Johns. Chan. Cases, 199; 8 Peters, 123; 1 Johns. Chan. Rep.
349, 437, 606; 4 Randolph, 74; 2 Gill and Johns. 14; 5 Paige,
65; 6 Dana, 186; 6 Johns. Chan. Rep. 163; Halsted's Dig. 168;
5 Cowen, 86.

The bill is not only multifarious as to parties and subject-matters,
but also as to jurisdictions. Suppose the will of 1813 were actually
probated and the plaintiff claimed under it, would this court act
upon such a question, or would they not rather send it to a court of
law to be tried?

The plaintiff confounds rights even in herself.

If the claim of legitimacy be established and the will of 1811
should remain, the testator by the old code could dispose of one-fifth
of his estate away from his child. (Old Civil Code, p. 212, art. 19,
chap. 3.) Mary Clark would, therefore, have one-fifth, and her heirs
ought to be parties. And besides, if the legitimacy be established,

the mother of the complainant must of course have been the wife of the testator, and as such, entitled to half of the estate, of which he could not deprive her. New Civil Code, art. 148; Old Civil Code, p. 336, art. 63 to 69. And yet the alleged wife is not a party.

So if the will of 1813 be set up, and the legitimacy proven, the wife will have half, and yet she is not made a party, although every one knows that she is living. The executors of the will of 1813 are said to have been Bellechasse and Pigot, the latter one of the judges of the Court of Probate. The commission is two and a half per cent. for executors. Did not Pigot know how to get the will, if there was one? New Civil Code, 2369 to 2376; Old Civil Code, p. 248, art. 179.

There is a multifariousness as to things.

The bill embraces twenty-six pieces of land, and it is not said who owns all these. And so of the slaves; ninety-three are allotted amongst different owners, whilst one hundred and thirty-three are not accounted for. An interest in the mere question is not sufficient to authorize all these persons to be joined in one bill; they must all have an interest in the subject-matter. Persons are also made parties who are said to be in the occupancy of a square of ground. What interest have they, if they are mere occupants? If their testimony would be admissible as impartial persons, they ought not to be parties.

An insuperable difficulty will be found if any of these sales of real estate have been made under a warranty. By the Louisiana law, in such a case, the warrantor may be summoned in at once to defend the title; and if he is not, the warrantee loses his remedy against him. But under the present process, this cannot be done, and the benefit of our wise law is lost. Our system has been called a mongrel system, but it is good enough for us. It does not follow that laws are unjust because they emanate from a despotic government. The Napoleon Code was not destroyed by the Bourbons. The practice in Louisiana is a complete equity; either party may arrive at the knowledge of facts in the possession of the other with more simplicity than the English chancery process. The district-attorney of the United States has preferred resorting to the state tribunals in a controversy between the government and Bank of the United States, rather than go into the federal court. To a case like the present, our system is peculiarly applicable. But in the proposed mode, you are deciding here the interests of a vast number of persons not seen at all.

The position that a state cannot enlarge or restrain the equity power of the Circuit Court of the United States, is laid down too broadly. The parliament of England might have placed the probate and jurisdiction over wills of real and personal estate exclusively in the ecclesiastical courts ; and if so, why cannot Louisiana do the same thing ? The sovereignty of a state over its domestic policy is complete, and especially over its land laws.   The clause in the Constitution was inserted, undoubtedly, for the security of impartial justice, but justice administered with uniformity by state and federal tribunals.   Both were intended to be guided by the same rules.   If they adopt different ones, you may obtain impartiality, but where is the uniformity.

There is another case upon the docket of this court by the complainants, in which they have prosecuted their claim singly against Patterson.   If they can maintain a suit against one of these numerous parties by himself, it shows that their interests must be distinct.

It is important to keep in view the distinction between overthrowing a proved will and setting up another one.   The will of 1811 is not said to be defective or irregular, but it is the probate which is objected to, and that is the judgment of a court of competent jurisdiction.   Until appealed from, it is as binding as a decree of this court. Story's Equity Pleadings, sect. 511 ; 2 Roper on Legacies, 532.

In 3 Merivale, 161, the Master of the Rolls says, " it is no question whether a chancery court can set up a will."   If an English court can overthrow the dictum of Lord Hardwicke 100 years ago, cannot the legislature of a free state do it?

Probate courts have exclusive jurisdiction over wills, and no other court can interfere, by the laws of Massachusetts.   4 Mason's Rep. 461 ; 16 Mass. Rep. 441.

The judgment of a court of probate is good until reversed. 4 Louis. Rep. N. S. 413, 414 ; 1 Louis. Rep. 21 ; 2 Louis. Rep. 250 ; 6 Louis. Rep. 656 ; 3 Louis. Rep. 519.

In 17 Louis. Rep. 14—16, it was held that where an action was brought in the District Court against one in possession and claiming under a will, if the will was set up, it might be inquired into. But that is not the present case, because it is not averred that Mary Clark's heirs are in possession.

The claim to set up the will of 1813 is attempted to be sustained by being made analogous to the case of a spoliated will in England, and the case in 1 Ves. jun. 286, relied on with great confidence, but it does not apply to the Circuit Court of the United States.   There

is no case which has been cited, in which the chancellor acted upon any other person than the wrong-doer himself. But here the executors are *functus officio*, and third persons, purchasers, are parties. Can they be imprisoned for not producing the will of 1813? and if Relf should be imprisoned, how can that affect the title of the city of New Orleans to property which it has held for twenty-five years. It has been said that a party can be decreed to be a trustee for the benefit of the person really interested. But before you can do this, you must repeal the statute of Louisiana, abolishing all trusts. They were abolished by the Code of 1808, and again by the Code of 1825. Civil Code (new) 1506, 1557.

Can this court fasten upon the people of Louisiana all the doctrine of uses and trusts, against their positive law? Suppose the purchasers are decreed to stand seised to the use of the complainant: you will have created fifty or sixty trusts. And when one of these trustees dies, or makes a *cessio bonorum*, what will be done? Will you sell an estate, the title to which is in one person, and the use in another? But the law of Louisiana positively prohibits this.

A power to compel a man to go before the court and resign his probate, is, in effect, a revocation of the judgment itself and an overthrow of the court. But the decision of that court can never be inquired into by another tribunal. 1 Pickering, 547. And the Probate Courts of Louisiana have as exclusive a jurisdiction as those of Massachusetts. The English cases are not applicable. 3 Porter, Al. Rep. 52, 58; 4 Missouri Rep. 210.

It is said by the other side that the Probate Courts of Louisiana are different from other Orphans' Courts. It is not so; but suppose it was. How can a citizen of another state claim more rights than a citizen of the state itself. The Constitution requires all to be placed upon an equal footing, but nothing more. In fact, the Louisiana Courts of Probate have more power than similar courts in Massachusetts. For these propositions, see Code of Practice, 324; 1 Story's Rep. 552; 2 Har. and Gill, 51; 4 Bibb, 553; 3 Missouri Rep. 365; 4 Missouri Rep. 210; Civil Code, (new) art. 21; Civil Code, (old) art. 246; Code of Practice, art. 130, 936; 8 Louis. Rep. (N. S.) 520; 5 Louis. Rep. 293; 11 Louis. Rep. 593, 150.

No court can now set up the will of 1813, because if it were presented to the Probate Court in the shape in which it is alleged to have existed, that court could not receive it for want of a date. Civil Code, art. 1567 to 1581; 1588, describes what wills are good;

1581 treats of an olographic will, i. e. written, dated, and signed, by the testator, and the next article says, unless these formalities are observed the will is null and void.

Civil Code, (old) art. 160, contains the same provisions. The date here is important, for if a will was written at all, it might have been before 1811, and therefore revoked by it.

Mr. Justice McLEAN delivered the opinion of the court.

This case is brought before the court from the eastern district of Louisiana, by a division of the judges on certain points, which are certified under the act of Congress.

The complainants in their bill state that Daniel Clark, late of the city of New Orleans, in the state of Louisiana, in the year 1813 died, seised in fee-simple, or otherwise well entitled to and lawfully possessed of, in the district aforesaid, a large estate, real and personal, consisting of plantations, slaves, debts due, and other property, all of which is described in the bill.

That the said Myra was the only legitimate child of the said Clark. That about the month of July, 1813, he made his last will and testament, according to law, and in which he devised to his daughter Myra all his estate, real and personal, except certain bequests named. Col. Joseph Deville, Degontine Bellachasse, James Pitot, and Chevalier Dusuau de la Croix were appointed executors of the will, and the said Chevalier de la Croix was also appointed tutor to the said Myra, who was then about seven years of age. In a few days after making the will the said Clark died.

From her birth, the said Myra was placed, by her father, in the family of Samuel B. Davis, who at the time resided in New Orleans, but in 1812 removed to Philadelphia, where the said Myra resided until her first marriage, being ignorant of her rights and her parentage.

In the year 1811, being about to make a journey to Philadelphia, and fearing some embarrassments from a partnership transaction, the said Clark conveyed property to the said Samuel B. Davis and others, to the amount of several hundred thousand dollars to be held in trust for the use of the said Myra. And about the same time he made a will devising to his mother, then residing out of Louisiana, his property, and appointed Richard Relf and Beverley Chew, two of the defendants, his executors. That afterwards, on his return from Philadelphia, he received back a portion of the property conveyed in trust as aforesaid; and by the will of 1813 revoked that of 1811.

The bill charges that immediately upon the death of the said Clark, the will of 1813 came into the possession of the said Relf, who fraudulently concealed, suppressed, or destroyed the same, and did substitute in its place the revoked will of 1811; that the will of 1813 was never afterwards seen except by the said Relf and Chew, and their confederates.

It is further charged that the said Relf fraudulently set up the revoked will of 1811, and obtained probate of the same; that he, with the said Chew, being sworn as executors, fraudulently took possession of the real and personal estate of the deceased, and also his title papers and books. That they appropriated to their own use large sums of money and a large amount of property of the estate, and in combination with the defendants named, who "had some knowledge, notice, information, belief or suspicion, or reason for belief or suspicion and did believe," so that the said Relf and Chew had acted fraudulently in setting up and proving the will of 1811. And the complainants pray that effect may be given to the will of 1813, and that the will of 1811 may be revoked; and that the defendants may be decreed to deliver up possession of the lands purchased as aforesaid, and account for the rents, &c.; and that the executors may be decreed to account    The complainants also represent that the said Myra is the only heir-at-law of the said Clark; and that his property descended to her, &c.    In addition to the special relief asked, the complainants pray for "such other and further relief in the premises, as the nature of the case may require."

To the bill, several of the defendants filed a special demurrer. On the argument of the demurrer, the opinions of the judges were opposed on the following points.

1. Is the bill multifarious? and have the complainants a right to sue the defendants jointly in this case.

2. Can the court entertain jurisdiction of this case, without probate of the will set up by the complainants, and which they charge to have been destroyed or suppressed.

3. Has the court jurisdiction of this case, or does it belong exclusively to a court of law.    The demurrer is not before the court, but the points certified.    In considering these points, all the facts stated in the bill are admitted.

Whether the bill be multifarious or not is the first inquiry.

The complainants have made defendants, the executors named in the will of 1811, and all who have come to the possession of pro-

perty real and personal, by purchase or otherwise, which belonged to Daniel Clark at the time of his death. That a bill which is multifarious may be demurred to for that cause is a general principle; but what shall constitute multifariousness is a matter about which there is a great diversity of opinion. In general terms a bill is said to be multifarious, which seeks to enforce against different individuals, demands which are wholly disconnected. In illustration of this, it is said, if an estate be sold in lots to different persons, the purchasers could not join in exhibiting one bill against the vendor for a specific performance. Nor could the vendor file a bill for a specific performance against all the purchasers. The contracts of purchase being distinct, in no way connected with each other, a bill for a specific execution, whether filed by the vendor or vendees, must be limited to one contract. It has been decided that an author cannot file a joint bill against several booksellers for selling the same spurious edition of his work, as there is no privity between them. But it has been ruled that a bill may be sustained by the owner of a sole fishery against several persons who claimed under distinct rights. The only difference between these cases would seem to be, that the right of fishery was necessarily more limited than that of authorship. And how this should cause any difference of principle between the cases is not easily perceived.

It is well remarked by Lord Cottenham, in Campbell *v.* Mackay, 7 Simon, 564, and in 1 Mylne and Craig, 603, "to lay down any rule, applicable universally, or to say, what constitutes multifariousness, as an abstract proposition, is, upon the authorities, utterly impossible." Every case must be governed by its own circumstances; and as these are as diversified as the names of the parties, the court must exercise a sound discretion on the subject. Whilst parties should not be subjected to expense and inconvenience, in litigating matters in which they have no interest, multiplicity of suits should be avoided, by uniting in one bill all who have an interest in the principal matter in controversy, though the interests may have arisen under distinct contracts.

In a course of reasoning in the above-cited case, Lord Cottenham observes, "If, for instance, a father executed three deeds, all vesting property in the same trustees, and upon similar trusts, for the benefit of his children, although the instruments and the parties beneficially interested under all of them were the same, it would be necessary to have as many suits as there were instruments. That is a proposition,

(he says,) to which I do not assent. It would, indeed, be extremely mischievous, if such a rule were established in point of law. No possible advantage could be gained by it; and it would lead to a multiplication of suits, in cases where it could answer no purpose to have the subject-matter of contest split up into a variety of separate bills." The same doctrine is found in Story's Equity Pleadings, sect. 534; Attorney-General *v.* Cradock, 3 Mylne and Craig, 85; 7 Sim. Rep. 241, 254.

In the above case against Cradock, the chancellor says, "The object of the rule against multifariousness is to protect a defendant from unnecessary expense; but it would be a great perversion of that rule, if it were to impose upon the plaintiffs, and all the other defendants, two suits instead of one."

The bill prays that the defendants, Relf and Chew, may be decreed to account for moneys, &c., which came into their hands, as executors, under the will of 1811; and that the other defendants, who purchased from them real and personal property, may be compelled to surrender the same, and account, &c., on the ground that they had notice of the fraud of the executors.

The right of the complainant, Myra, must be sustained under the will of 1813, or as heir-at-law of Daniel Clark. The defendants claim mediately or immediately under the will of 1811, although their purchases were made at different times and for distinct parcels of the property. They have a common source of title, but no common interest in their purchases. And the question arises on this state of facts, whether there is misjoinder or multifariousness in the bill, which makes the defendants parties.

On the part of the complainants there is no misjoinder, whether the claim be as devisee or heir-at-law. And the main ground of the defence, the validity of the will of 1811, and the proceedings under it, is common to all the defendants. Their interests may be of greater or less extent, but that constitutes a difference in degree only, and not in principle. There can be no doubt that a bill might have been filed against each of the defendants, but the question is whether they may not all be included in the same bill.

The facts of the purchase, including notice, may be peculiar to each defendant; but these may be ascertained without inconvenience or expense to co-defendants. In every fact which goes to impair or establish the authority of the executors, all the defendants are alike interested. In its present form the bill avoids multiplicity of suits,

without subjecting the defendants to inconvenience or unreasonable expense. There are, however, two exceptions to this remark, one of which relates to Caroline Barnes and her husband. She is represented to be a devisee in the will of 1813, and, consequently, can have no common interest under the will of 1811. The other exception is, the prayer of the bill that the executors may account. In the rendition of this account the other defendants have no interest, and such a matter, therefore, ought not to be connected with the general objects of the bill. The bill in these respects may be so amended, in the Circuit Court, as to avoid both the exceptions.

We come now to inquire " whether the court can entertain jurisdiction of this case, without probate of the will set up by the complainants, and which they charge to have been destroyed or suppressed."

The bill charges that the will of 1813 was fraudulently suppressed or destroyed by Relf; and that he fraudulently procured the will of 1811, in which he and Chew were named as executors, to be proved.

It is contended that the Court of Probate in Louisiana has exclusive jurisdiction of the probate of wills, and that a Court of Chancery can exercise no jurisdiction in such a case.

In the Code of Practice, art. 924, it is declared, that " Courts of Probate have the exclusive power :"

1. " To open and receive the proof of last wills and testaments, and to order the execution and recording them." There are thirteen other specifications which need not be named. By art. 925, it is declared that, " the Courts of Probates shall have no jurisdiction except in the cases enumerated in the preceding article, or in those which shall be mentioned in the remaining part of this title."

In regard " to the opening and proving of wills," after providing where application for probate shall be made, and the mode, the following articles are adopted.

Art. 934. " If the will be contained in a sealed packet, the judge shall order the opening of it at the time appointed by him, and shall then proceed to the proof of the will."

Art. 936. " If the petitioner alleges under oath in his petition, that he is informed that the will of the deceased, the opening of which and its proof and execution are prayed for, is deposited in the hands of a notary or any other person, the judge shall issue an order to such notary or other person, directing him to produce the will or the packet containing it, at a certain time to be mentioned, that it

may be opened and proved, or that the execution of it may be ordered."

Art. 937. "If the notary or other individual to whom the said order is directed, refuses to obey it, the judge shall issue an order to arrest him, and if he does not adduce good reasons for not producing the will, shall commit him to prison until he produces it; and he shall be answerable in damages to such persons as may suffer from his refusal."

From the above provisions it is clear that, in Louisiana, the Court of Probates has exclusive jurisdiction in the proof of wills; and that its jurisdiction is not limited, like the ecclesiastical court in England, to wills which dispose of personal property. Has a court of equity power to set up a spoliated will, and carry it into effect?

Formerly it was a point on which doubts were entertained, whether courts of equity could not relieve against a will fraudulently obtained. And there are cases where chancery has exercised such a jurisdiction. Maundy *v.* Maundy, 1 Chan. Rep. 66; Welly *v.* Thornagh, Prec. Chanc. 123; Goss *v.* Tracy, 1 P. Williams, 287; 2 Vernon, 700. In other cases, such a jurisdiction has been disclaimed, though the fraud was fully established, as in Roberts *v.* Wynne, 1 Chan. Rep. 125; Archer *v.* Moss, 2 Vernon, 8. In another class of cases the fraudulent actor has been held a trustee for the party injured. Herbert *v.* Lawnes, 1 Chan. Rep. 13; Thynn *v.* Thynn, 1 Vernon, 296; Devenish *v.* Baines, Prec. Chan. 3; Barnesly *v.* Powell, 1 Ves. 287. These cases present no very satisfactory result as to the question under consideration. But since the decision of Kenrick *v.* Bransby, 3 Brown's P. C. 358, and Webb *v.* Cleverden, 2 Atkyns, 424, it seems to be considered as settled, in England, that equity will not set aside a will for fraud and imposition. The reason assigned is, where personal estate is disposed of by a fraudulent will, relief may be had in the ecclesiastical court; and at law, on a devise of real property. Bennett *v.* Vade, 2 Atkyns, 324; 3 Atkyns, 17; Gingoll *v.* Horne, 9 Sim. 539; Jones *v.* Jones, 3 Mer. 171.

In the last case the Master of the Rolls says, "it is impossible that, at this time of day, it can be made a serious question, whether it be in this court that the validity of a will, either of real or personal estate, is to be determined."

In cases of fraud, equity has a concurrent jurisdiction with a court of law, but in regard to a will charged to have been obtained through fraud, this rule does not hold. It may be difficult to assign any very

satisfactory reason for this exception. That exclusive jurisdiction over the probate of wills is vested in another tribunal, is the only one that can be given.

By art. 1637 of the Civil Code, it is declared that "no testament can have effect unless it has been presented to the judge," &c. And in Clappier et al. v. Banks, 11 Louis. Rep. 593, it is held, that a will alleged to be lost or destroyed and which has never been proved, cannot be set up as evidence of title, in an action of revendication.

In Armstrong v. Administrators of Kosciusko, 12 Wheat. 169, this court held, that an action for a legacy could not be sustained under a will which had not been proved in this country before a court of probate, though it may have been effective, as a will, in the foreign country where it was made.

In Tarver v. Tarver et al., 9 Peters, 180, one of the objects of the bill being to set aside the probate of a will, the court said, "the bill cannot be sustained for the purpose of avoiding the probate. That should have been done, if at all, by an appeal, from the Court of Probate, according to the provisions of the law of Alabama."

The American decisions on this subject have followed the English authorities. And a deliberate consideration of the question leads us to say, that both the general and local law require the will of 1813 to be proved, before any title can be set up under it. But this result does not authorize a negative answer to the second point. We think, under the circumstances, that the complainants are entitled to full and explicit answers from the defendants, in regard to the above wills. These answers being obtained may be used as evidence before the Court of Probate to establish the will of 1813 and revoke that of 1811.

In order that the complainants may have the means of making, if they shall see fit, a formal application to the Probate Court, for the proof of the last will and the revocation of the first, having the answers of the executors, jurisdiction as to this matter may be sustained. And, indeed, circumstances may arise, on this part of the case, which shall require a more definite and efficient action by the Circuit Court. For if the Probate Court shall refuse to take jurisdiction, from a defect of power to bring the parties before it, lapse of time, or on any other ground, and there shall be no remedy in the higher courts of the state, it may become the duty of the Circuit Court, having the parties before it, to require them to go before the Court of Probates, and consent to the proof of the will of 1813 and the revoca-

tion of that of 1811. And should this procedure fail to procure the requisite action on both wills, it will be a matter for grave consideration, whether the inherent powers of a court of chancery may not afford a remedy where the right is clear, by establishing the will of 1813. In the case of Barnesly *v.* Powell, 1 Ves. sen. 119, 284, 287, above cited, Lord Hardwicke decreed, that the defendant should consent, in the ecclesiastical court, to the revocation of the will in controversy and the granting of administration, &c. If the emergencies of the case shall require such a course as above indicated, it will not be without the sanction of Louisiana law. The twenty-first article of the Civil Code declares that, "in civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages where positive law is silent."

This view seemed to be necessary to show on what ground and for what purpose jurisdiction may be exercised in reference to the will of 1813, though it has not been admitted to probate.

The third point is, "has the court jurisdiction in this case, or does it belong exclusively to a court of law?"

Much that has been said in relation to jurisdiction on the second point, equally applies to this one. Indeed, they might have been considered under the same general head.

The bill is inartificially drawn, and, to reach its main objects, may require amendment in the Circuit Court. It presents the right of the complainants in two aspects:

1. Under the will of 1813.

2. As heir-at-law of the deceased.

The first has been examined, and we will now consider the second.

In prosecuting their rights as heir-at-law by the complainants, no probate of the will of 1813 will be required. The complainants must rest upon their heirship of the said Myra, the fraud charged against the executors, in setting up and proving the will of 1811, and notice of such fraud by the purchasers. In this form of procedure, the will of 1811 is brought before the court collaterally. It is not an action of nullity, but a proceeding which may enable the court to give the proper relief without decreeing the revocation of the will. Such a proceeding at law in regard to real estate is one of ordinary occurrence in England. And it is upon the ground that such a remedy is plain and adequate, that equity will not give relief. There can be no doubt, as between the heir-at-law and devisee, in ordinary

cases, the proper remedy is to be found in a court of law. Without enlarging on this point, at present, we will refer to the doctrine on this subject as established by the Louisiana courts. The case of O'Donagan *v.* Knox, 11 Louis. Rep. 384, was "an heir-at-law claiming a share of the succession of her deceased sister, who was the wife of the defendant, who holds possession of it under a will, as instituted heir and universal legatee." The defendant pleaded to the jurisdiction of the District Court, on the ground that the Court of Probates for the parish St. Landry had exclusive jurisdiction of the matters and things set up in the petition."

The district judge held, "that as the will sought to be annulled had been admitted to probate, and ordered to be executed, the court had no jurisdiction, but that the Probate Court had exclusive jurisdiction of the case."

After stating the above decision of the District Court, the Supreme Court say, "The plaintiff sets up a claim under the law of inheritance to lands, slaves, and a variety of movable property; that these are proper subjects for the exercise of the jurisdiction of district courts cannot be doubted. But the petitioner proceeds further, and alleges the nullity of the will, which constitutes the very title under which the defendant holds the property in controversy. Before what court then must the validity of this will be tested?"

The court consider the jurisdiction of the Court of Probates, and then proceed to say, "It appears that the jurisdiction of the courts of probates is limited to claims against successions for money, and that all claims for real property appertain to the ordinary tribunals, and are denied to courts of probate. The plaintiff in this case was, therefore, compelled, in suing for the property of the succession, to seek redress in the District Court, and whether she attacked the will, or the defendant set it up as his title to the property, the court having cognisance of the subject must of necessity examine into its legal effect."

"When in an action of revendication a testament with probate becomes a subject of controversy, it will surely not be contended," say the court, "that a court of ordinary jurisdiction, having cognisance of the principal matter, shall suspend its proceedings until another court of limited powers shall pronounce upon the subject." "If the ordinary courts should examine into the validity of testaments, drawn in controversy before them, they will do no more than we have often said a court of limited jurisdiction may do, even in relation to a question it could not directly entertain." The court cite

Lewis's heirs v. His executors, 5 Louis. Rep. 387, and say there is no conflict, as indeed there is none, between that case and the one before them. They say that in the case before them the functions of the executor had expired, the probate of the will had taken effect, and the devisee had entered into possession under it. The decision of the District Court was reversed on the ground that it had jurisdiction of the case.

The above doctrine is fully affirmed in Robert v. Allier's agent, 17 Louis. Rep. 15. "On the question of jurisdiction arising from the state of the case, we understand," say the court, "the distinction repeatedly made by this court to be, that whenever the validity or legality of a will is attacked, and put at issue, (as in the present case,) at the time that an order for its execution is applied for, or after it has been regularly probated and ordered to be executed, but previous to the heirs or legatees coming into possession of the estate under it, Courts of Probate alone have jurisdiction to declare it void." "But when an action of revendication is instituted by an heir-at-law, against the testamentary heir or universal legatee who has been put in possession of the estate, and who sets up the will as his title to the property, District Courts are the proper tribunals in which suits must be brought." 6 Martin's N. S. 263   2 Louis. Rep. 23

The functions of the executors under the will of 1811 have long since terminated, and the property of the deceased, both real. and personal, has passed ·into the hands 'of purchasers. If the heir-at-law and the devisee were the only litigant parties, a suit at common law might afford·an adequate remedy. But the controversy is rendered complicated by the numerous parties and the various. circumstances under which their purchases were made. Besides, many facts essential to the complainant's rights are within the knowledge of the defendants, and may be proved only by their answers. Of this character is the fraud charged against the executors in proving the will and acting under it, and the notice of such fraud before their purchase, alleged against the other defe ants.

If the fraud shall be established against the executors, and a notice of the fraud by the other defendants, they must be considered, though the sales have the forms of law, as holding the property in trust for the complainants. Under these circumstances a suit at law could not give adequate relief. A surrender of papers and a relinquishment of title may become necessary. The powers of a Court of Chan-

cery, in this view, are required to do complete justice between the parties.

This remedy under the Louisiana law, and before the Louisiana courts, of ordinary jurisdiction, would be undoubted. For, although those courts cannot annul the probate of a will, when presented collaterally, as a muniment of title, they inquire into its validity. Under the peculiar system of that state the forms of procedure being conformable to the civil law, are the same in all cases. But the Circuit Court of the United States, exercising jurisdiction in Louisiana, as in every other state, preserves distinct the common law and chancery powers. In either the state or federal court the relief is the same; the difference consists only in the mode of giving it.

It is insisted that trusts are abolished by the Louisiana code, and that, consequently, that great branch of equity jurisdiction cannot be exercised in that state.

Art. 1507 of the Civil Code declares, "that substitutions and *fidei commissa* are and remain prohibited." "Every disposition by which the donee, the heir or legatee, is charged to preserve for, or to return a thing to a third person, is null, even with regard to the donee, the instituted heir, or the legatee," &c.

This abolishes express trusts, but it does not reach nor affect that trust which the law implies from the fraud of an individual who has, against conscience and right, possessed himself of another's property. In such a case the Louisiana law affords redress as speedily and amply as the law of any other state. There is, therefore, no foundation for the allegation, that an implied trust, which is the creature of equity, has been abrogated in Louisiana. Under another name it is preserved there in its full vigour and effect. Without this principle, justice could not be administered. One man possesses himself wrongfully and fraudulently of the property of another; in equity, he holds such property in trust, for the rightful owner.

In answer to the objection, that the validity of the will of 1811, collaterally, can only be tested by an action at law and on an issue *devisavit vel non*, it may be said, that such an issue may be directed by the Circuit Court.

Complaint is made that the federal government has imposed a foreign law upon Louisiana. There is no ground for this complaint. The courts of the United States have involved no new or foreign principle in Louisiana. In deciding controversies in that state the local law governs, the same as in every other state. Believing that

the mode of proceeding there in the state courts, was adequate to all the purposes of justice; and knowing with what pertinacity even forms are adhered to, I was averse to any change of the practice in the federal courts. But I was overruled; and I see in the change only a change of mode, which produces uniformity in the federal courts, throughout the Union. No right is jeoparded by this, and to say the least, wrongs are as well redressed, and rights as well protected, by the forms of chancery as by the forms of the civil law.

From the foregoing considerations, the court answer the first point certified in the affirmative, subject to the amendments of the bill, as suggested. And they answer the second and third points, with the qualifications stated, also in the affirmative.

Mr. Justice CATRON.

I agree the points certified must be answered favourably to the complainants; but I do not altogether agree with the reasoning that has led a majority of my brethren to this conclusion.

The answer to the second question, controls the answers to the others; it is, "Can the Circuit Court entertain jurisdiction of this case, without probate of the will set up by the complainants, and which they charge to have been destroyed, or suppressed?"

The will of 1813, cannot be set up, without a destruction of the will of 1811; this will has been duly proved, and stands as a title to the succession of the estate of Daniel Clark; nor can the Circuit Court of the United States set the probate aside: this can only be done by the Probate Court.

Nor can the will of 1813, be set up in chancery, as an inconsistent and opposing succession to the estate, while the will of 1811, is standing in full force. Such is the doctrine in the English Court of Chancery, as will be seen by the cases of Archer v. Mosse, 2 Vern. 8; Beale v. Plume, 1 P. Wms. 388—and which are confirmed by the case of Kenrick v. Barnsby in the House of Lords, 7 Bro. P. Cases, 437. Nor do the doubtful suggestions of Lord Hardwicke in Barnsby v. Powel, 1 Ves. sen. 119, 284, conflict with the previously settled doctrine, as I understand that case. The argument that a fraudulent probate is a fraud on the living, and therefore chancery can give relief by setting aside such probate, is a mistaken idea of the chancery powers. Surely the probate of a fraudulent or forged paper, is a fraud on the living, as much as the suppression of the last will, and the causing to be proved, a revoked one; still chancery has not assumed

jurisdiction to set aside the probate of a will alleged to have been forged or to be fraudulent, after the testator's death; as will be seen by the cases cited; although he who committed the fraud, or forgery, procured the probate to be had of the paper, in the Probate Court.

It by no means follows, however, that the court below has no jurisdiction of the case made by the bill in one of its aspects. Mrs. Gaines claims to be the only child and lawful heir of Daniel Clark. This we must take to be true. By the Civil Code of 1808, ch. 3, sec. 1, art. 19, p. 212, it is declared "That donations either *inter-vivos*, or *mortis causâ*, cannot exceed the fifth part of the property of the disposer, if he leaves at his decease one or more legitimate children or descendants, born or to be born."

By the case made in the bill, Mr. Clark could only dispose of one-fifth part of his property at the time of his death; provided he had no wife living; and if she was living, then only of the one-fifth part of one half. It follows, if the will of 1811, is permitted to stand as Daniel Clark's last and only will, that Mrs. Gaines can come in as heir for the four-fifths. On this aspect of the bill she can proceed to establish, and enforce her rights as heir, without making probate of the will of 1813—and the second question must be answered in the affirmative.

By the will of 1811, Mary Clark is the principal devisee. She made her will and died; by this will, Caroline Barnes is entitled to part of Daniel Clark's estate, and ought to be before the court to maintain her rights. I, therefore, do not concur that as to her the bill is multifarious. As to the purchasers from the executors, I have more difficulty. I agree, where there is one common title in the complainant; and this could only be the true source of all the titles in all the defendants, and they have not obtained the first link in the chain of title; that than the true owner may sue them together in chancery, although they claim by separate purchases from a spurious source. Such is the general rule; nor do I think the purchasers from Chew and Relfe, are exempt from its operation, on the ground that they have no concern with the settlement of the accounts growing out of the administration. I therefore concur in answering the first question—that the bill is not multifarious.

The third question presents no difficulty as to the executors; they are properly sued in chancery for distribution beyond doubt: and so I imagine are the devisees of Mary Clark; they being by the will of

Mrs. Clark co-distributees with Mrs. Gaines under the will of 1811, as to the one-fifth part of Daniel Clark's estate.

The purchasers are charged with having purchased with knowledge of Mrs. Gaines's superior title; and with having fraudulently purchased from the executors with such knowledge; there being jurisdiction to grant relief against the executors, in chancery, the same court can grant relief against the purchasers, involved in the fraud of the executors. If they could be compelled to account in regard to the real estate when it remained in their hands; purchasers with notice of Mrs. Gaines's rights; and who purchased with the intention to defeat her rights and deprive her of them, can stand in no better situation than the executors, and must account likewise; both being held in a court of equity equally as trustees for the true owner. Therefore, on the face of the bill, a court of equity has jurisdiction; and a court of law has not exclusive jurisdiction, and thus the third point ought to be certified.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Louisiana, and on the points and questions which were certified to this court for its opinion agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, It is the opinion of this court that the first question should be answered in the affirmative; but that the bill should be so amended in the Circut Court as to avoid both of the exceptions stated in the opinion of this court, and that the second and third questions should also be answered in the affirmative, with the qualifications stated in the opinion of this court. Whereupon, it is now here ordered and adjudged, that it be so certified to the judges of the said Circuit Court.