# THE BOARD OF SUPERVISORS OF WHITESIDE COUNTY, STATE OF ILLINOIS,

## *v.*

# ROBERT C. BURCHELL, STATE'S ATTORNEY OF THE TWENTY-SECOND JUDICIAL CIRCUIT OF THE STATE OF ILLINOIS, AND PETER BRESSLER.

1. PARTIES IN CHANCERY—*State's attorney.* A State's attorney, as such, has no interest in the application of the proceeds of the sales of swamp lands in the counties comprising his circuit, and is not a proper party complainant, in a suit in chancery, instituted for the purpose of compelling. a county to appropriate such proceeds to the reclamation of the lands.

2. SAME—*misjoinder.* But if it were the duty of the State's attorney to originate a proceeding for such a purpose, it would be improper to join with him, as complainant, one who seeks relief personal to himself, as a purchaser . of swamp lands from the county, his interest being in no way identified with the general interests represented by the State's attorney.

3. MULTIFARIOUSNESS—*what constitutes.* And where the State's attorney thus joins with another person in exhibiting their bill, the former seeking to compel the county to execute certain alleged trusts devolving upon it by the conveyance of the swamp lands by the State to the county, while his co-complainant bases his claim to relief upon a contract, and purchase of these lands of the county, which he alleges should be discharged in labor, the bill is multifarious.

4. GENERAL DEMURRER—*multifariousness.* Multifariousness may be taken advantage of upon general demurrer.

5. SWAMP LANDS—*character of the grant to the State.* By the grant of swamp and overflowed lands to the State of Illinois, under the provisions of the act of Congress, of September 28, 1850, to enable the State of Arkansas and other States to reclaim the "swamp lands" within their limits, a fee simple estate passed, unconditionally. The State became the absolute owner of the lands, with power to dispose of them in such manner, and for such purposes, as to the legislature might seem most expedient.

6. SAME—*policy of the State.* It was the intention of the General Assembly, under the various acts on the subject, to grant to the several counties in the State, the swamp and overflowed lands within their limits, respectively, and to remit to such counties the exclusive control over these lands, and over their proceeds.

7. SAME—*rights of purchasers—obligation of counties.* So, where a party purchased swamp lands from a county in 1856, and executed his notes for the absolute payment of the purchase-money, he has no remedy to compel the

county to appropriate the proceeds of the sales of such lands to their reclamation, as was contemplated by the legislation on the subject, in force at the time of his purchase ; but his rights in that regard are to be determined by the policy subsequently adopted by the legislature, which placed the whole subject of the control of these lands, and the appropriation of their proceeds, in the hands of the several counties, and released them from all the liabilities and obligations theretofore imposed upon them respecting them.

8.    And where such purchaser claimed the right to pay the purchase-money for which he had given his notes, in labor to be bestowed in the reclamation of the lands, it was *held*, that he could in no way have insisted upon such right, except by being the lowest bidder at the lettings of the work under the act of June 22, 1852, and that under the subsequent legislation the county was under no obligation to carry out the system of reclamation of the lands as contemplated by that act.

9.    POWER OF COURTS OVER THE LEGISLATURE. Even if the grant of the swamp lands to the State had been made upon the trust that the proceeds of the lands should be expended in reclaiming them, such a trust would have been of municipal and not judicial concern, over which the power of the State would have been plenary and exclusive. The courts have no power to compel the legislature to execute such a trust.

WRIT OF ERROR to the Circuit Court of Whiteside county ; the Hon. JOHN V. EUSTACE, Judge, presiding.

This was a bill in chancery exhibited in the Circuit Court, on the second day of May, 1860, by Robert C. Burchell, State's attorney of the twenty-second judicial circuit, and Peter Bressler, against the Board of Supervisors of Whiteside county. The decree in the court below was rendered in favor of the complainants, upon a demurrer to the bill, the objects and scope of which are sufficiently set forth in the opinion of the court.

The Board of Supervisors bring the cause to this court upon writ of error.

Mr. F. SACKETT, for the plaintiffs in error.

The rights and interests of the complainants are entirely distinct, Burchell appearing on behalf of the People, and Bressler appearing in his own right. There is a misjoinder of parties complainant ; and the bill is multifarious in setting forth distinct grounds of complaint, and asking a different character of relief on behalf of the several complainants.

Burchell assumes a position in opposition to the county, which is inconsistent with his duty as State's attorney ; it is his duty to defend all actions brought against the counties within his circuit. Moreover, the State's attorney cannot commence suits in his own name, where the interests of the State are involved. Rev. Stat. 1845, ch. 12, sec. 4.

All suits in which the State shall be a party plaintiff or complainant, are required to be instituted and prosecuted in the name of the People of the State. Rev. Stat. 1845, ch. 29, secs. 51, 52.

Each of these objections may be taken upon general demurrer. 1 Daniell Ch. Prac. 617, 395; Story's Eq. Pl., secs. 47, 279, 509.

The swamp and overflowed lands were granted to the State by the act of Congress, of September 28, 1850, and the trust thereby reposed by the United States in the State of Illinois was a personal trust in the public faith of the State, and not a property trust, and is exclusively under the control of the legislature of the State. *Dunklin County* v. *The District County Court of Dunklin County*, 23 Mo. 449. The same general principle is sustained in *Cooper* v. *Roberts*, 18 How. 173, and in *Long* v. *Brown*, 4 Ala. 622.

The court could not, by decree, or otherwise, direct the legislation of the State on the subject.

The entire action of the legislature on this subject, shows that it was the intention of the General Assembly, as a matter of public policy, to leave the whole subject of the management, sale and disposition of the proceeds of the sales of swamp lands exclusively to the people of the different counties, in which they lie, through their respective County Courts, or boards of supervisors.

Act of February, 1855, (Sess. Acts, 1855, p. 48); act of 10th February, 1857, (Sess. Acts, 1857, p. 41) ; act of Feb. 9, 1859, (Sess. Acts, 1859, p. 202); act of Feb. 24, 1859, (Sess. Acts, 1859, p. 189); and finally, the act of 14th February, 1859, by which the whole subject of the disposition of these lands was placed under the exclusive control of the several counties, and they were released from all liabilities and

obligations imposed by former acts, requiring them to drain the lands, or in reference to the disposition of the proceeds of the sales of the lands.

Although Bressler purchased from the county at the time the acts were in force which provided for the reclamation of these lands, yet the legislature had the power, by subsequent legislation, to abandon that policy, and to divert the proceeds of the sales to any other purpose they might deem to be proper.

The rights which Bressler acquired in that regard were not such as are within the protection of the provision of the constitution, prohibiting the legislature from passing any law impairing the validity of contracts. 2 Parsons on Con., p. 511; *Butler* v. *Pennsylvania*, 10 How. 402; *Satterlee* v. *Mattheson*, 2 Peters R. 380; 1 Am. Railway Cases, p. 1.

In reference to the privilege which Bressler claims, of working out the amount of the purchase-money of the lands, in reclaiming them, it is not pretended, on his part, that any special contract was entered into by the county, at the time of the sale, in reference to the purchase-money being paid in that way; and under the act of June 22, 1852, he could only have such right in the event of his becoming a contractor under the lettings which might afterwards be made by the county in carrying out the policy of reclaiming the lands, which was subsequently abandoned.

Messrs. Johnson & Teller, for the defendants in error, did not propose to discuss the question whether the State took these lands under the act of Congress, free from all incumbrance, and by an absolute title, or in trust for a certain object, as it was not necessary to a proper understanding of the case; but insisted that the language of that act, and the case in 23 Missouri R. 449, were conclusive in favor of the grant as a trust.

But if this were not so, and the grant to the State were absolute, yet it it was competent for the General Assembly to make the county a *trustee* for the disposal of the lands, and the appropriation of the proceeds; and this was done by the

act of 22nd June, 1852. For the definition of a trust, see 2 Lill. Abr. 624.

The trust having been thus created, and the county having taken upon itself to execute it in part, the court had the power to compel the county to execute the trust in all respects.

But it is said, the act of February 14th, 1859, gives to the board full power to dispose of the lands and the moneys arising from the sale thereof, as the board shall see fit. Yet it is clear that so far as that act relates to contracts for the sale of said lands made before its passage, it is in violation of Sec. 17, Art. 13, of the Constitution of the State; and as courts are bound to construe the law so that it may be constitutional and valid, when they will admit of such construction, the law in question must be held to apply only to contracts made after its passage.

There is no misjoinder of parties complainant. "All persons who are *interested* in the object of the suit, ought to be made parties to it." Story's Eq. Pl., secs. 76, 77, and notes. The *people* of the county had an interest in the object of this suit, growing out of the fact that the draining of these lands would have been beneficial to the health of the community.

Burchell, as State's attorney, stands as the representative of the people, and it was his right and duty to commence and prosecute this suit for the people; and as Bressler's rights were different from those of the people at large, he was a necessary party.

Mr. JUSTICE BREESE delivered the opinion of the Court.

The questions upon this record arise on a demurrer to a bill in chancery, predicated on an alleged improper joinder of complainants, and upon the merits of the bill itself.

It is insisted by the plaintiffs in error, that the State's attorney has no interest in common with his co-complainant, Bressler, in the subject-matter of the bill itself, nor has he any authority to institute such suit, in virtue of his official position. It is further urged, that the rights and interests of the com-

plainants, as disclosed by the bill, rest upon dissimilar foun dations, that the relief sought by the one, has no homo genity with that sought by the other complainant, and therefore the demurrer should have been sustained.

The complainants insist, as the object of the bill was to compel the defendants to expend the moneys received on the sale of the swamp lands within the county, in draining and reclaiming them, all the people of the county have an interest in that object; and as the State's attorney stands as the repre- sentative of the people of the county, it was both his right and duty to commence and prosecute this suit, and he was not only a proper, but a necessary party to the bill.

We have always understood, that the duties of State's attorney were of special and well defined character. They are, in brief, to commence and prosecute all actions, writs, process, indictments, and prosecutions, civil and criminal, in which the people of the State, or any county within his judicial district, may be concerned, to defend actions brought in his circuit against the auditor of public accounts, or against any of the counties therein, and to prosecute all forfeited recognizances and all suits and actions for the recovery of debts, revenues, etc., accruing to the people of the State, or any county within his circuit, and to give his opinion, when requested, to any County Court or justice of the peace in his circuit, upon any question of law relating to any criminal or other matters in which the people or the county is concerned. Scates' Comp. 674.

There does not seem to be any power vested in this officer, of his own mere motion, to originate any prosecution, civil or criminal, in his own name, or to occupy a hostile attitude to a county within his circuit, as he here appears to do. He is the instrument of the law to commence and prosecute suits in all cases in which he may be instructed by the proper author- ities, in the name of the People of the State, or of a county, and for their use. As State's attorney, he has no more inter- est in the application of the proceeds of the sale of the swamp lands lying in a particular county of his circuit, than the sheriff or clerk has. Nor is he more to be regarded as

the representative of the people of the county than either of those officers. They are all officers of the law, to act when properly called upon, and then in a proper manner. He appears out of his sphere in contending against the county, whom he should represent.

But admitting it was the duty of the State's attorney to originate a proceeding for the purposes contemplated, it may be asked, in whose name should it be, and why join another party as complainant, whose interests are wholly personal to himself, and in no way identified with those represented by the State's attorney? We can perceive no reason for the joinder of these parties. It was an improper joinder, and the demurrer should have been sustained on that ground. The bill is multifarious also, as several complainants join in a bill demanding distinct matters against the same defendants. Here the State's attorney bases his claim to relief under and in virtue of certain alleged trusts devolving on the county by the conveyance of the lands by the State to the county, whilst his co-complainant bases his claim upon a contract and purchase of a portion of these lands of the county which he alleges should be discharged in labor. Whilst the State's attorney prays that the county should be enjoined from appropriating any of the proceeds of their lands to the school fund but to their drainage, his co-complainant prays that the county may be enjoined from collecting the notes executed for the purchase-money, and that he be allowed to discharge them in labor in making drains and reclaiming the land. This multifariousness can be taken advantage of by general demurrer. 1 Daniell Ch. Prac., p. 395.

Now as to the merits of the bill. Its object seems to be to compel the county of Whiteside to execute, specifically, a trust supposed to have devolved upon it, by reason of the surrender to it, by the State, of the swamp and overflowed lands lying within it, which were granted to the State by the act of Congress of Sept. 28, 1850. This is the ground of the claim set up by the State's attorney, whilst his co-complainant seeks to compel the county to enforce the act of the General Assembly of June 22, 1852, in all its parts, so that he may

be enabled to pay for that portion of those lands which he has purchased, and for which he has executed his notes and mortgage, in labor to be expended by him in draining and reclaiming the lands, and for this he has obtained a decree.

An inquiry into the legislation of Congress and of our General Assembly on the subject of these lands, will show, we think, satisfactorily, that there is no ground or reasonable pretense whatever for the claims set up.

On the 28th of September, 1850, Congress passed an act to enable the State of Arkansas and other States to reclaim the " swamp lands" within their limits. The first section of the act is as follows:

That to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be and the same are hereby granted to said State.

The second section provides that the Secretary of the Interior shall make out accurate lists and plats of these lands, and transmit the same to the Governor of that State, and, at his request, shall issue a patent therefor, and on that patent the fee simple to those lands shall vest in the State of Arkansas, subject to the disposal of the legislature of that State. Provided, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of drains and levees. The third section provides that if the greater part of all legal subdivisions of such lands shall be wet and unfit for cultivation, the whole subdivision shall be included in the list.

The fourth section provides that the provisions of the act shall extend to, and their benefits be conferred upon, each of the other States of the Union in which such swamp and overflowed lands may be situated. Laws U. S., vol. 9, p. 520; Scates' Comp. 1146.

By an act passed by the General Assembly of this State, approved June 22, 1852, all the swamp and overflowed lands

were granted to the counties respectively, in which the same were situated, for the purpose of constructing the necessary levees and drains to reclaim them, and the balance of the lands, if any remained after they were reclaimed, were distributed in each county equally among the townships thereof, for the purposes of education, or in the construction of roads and bridges, or to such other purposes as might be deemed expedient by the courts or county judge, etc. An abstract of the lands was to be furnished by the auditor to the several counties, to be recorded in a book to be provided for that purpose by the county clerk, and filed among the records of his office. Provision is then made for a sale of the lands, and the mode thereof prescribed. The fourth section provides that the terms of selling said lands shall be to the highest bidder for cash, the amount of which, however, may be discharged by the purchaser in labor, to be performed according to the terms and manner hereinafter specified.

It is further provided, that the drainable lands shall be divided into sections, and when sufficient lands are sold to complete a section, it shall be put under contract. Section fourteen provides that the County Court shall cause the work to be done on the sections to be let out at public sale to the lowest bidder, who shall give bond (Sec. 15) conditioned for the faithful performance of the work, etc. Section sixteen provides that the County Court shall lay off the divisions in such manner as will enable the purchasers of the land to pay for the same in necessary work; and if said purchasers shall be the lowest bidders at the lettings, the land so purchased shall be paid for in work; but if any other responsible persons shall be lower bidders, it shall be struck off to them, and the purchasers shall be forthwith required to pay for their lands purchased, in cash or on credit, by giving mortgage and good security for the purchase-money, at the discretion of the drainage commissioners. Section seventeen provides that no more lands shall be sold than may be necessary to complete the reclaiming and drainage; and if there be a residue, it shall be divided equally among the several townships of the county, and constitute a part of the school fund, or the

remainder may be applied in the construction of roads, bridges or other works of internal improvement within the limits of the county. Scates' Comp. 1148 to 1154.

By an act passed March 4, 1854, to amend the act of June 22, 1852, it is provided by the twelfth section, that all the parts of the acts to which this is an amendment, which appear to grant the swamp and overflowed lands to the townships in the several counties, and which authorize the county judges to execute deeds, and all other parts of said acts which are inconsistent with the provisions of this act, are repealed, and all the swamp and overflowed lands granted to this State by the act of Congress, are granted to and vested in the several counties in which they are situated. Scates' Comp. 1160.

At the same session of the legislature, the swamp lands lying in the county of Kankakee, were granted to that county without any conditions or restrictions. At the next session, on the 15th of February, 1855, an act was passed diverting the proceeds of these lands from drainage and levees, to the school fund of the county, and Adams county was authorized to do as she pleased with the proceeds of these unsold lands. At the session of 1857, the funds arising from the sale of these lands in the counties of Green and Massac, were diverted from drainage and levees, and ordered to be paid over to the counties respectively, to be used in their discretion ; and the same legislation was adopted for Brown county.

At the session of 1859, a general act was passed, entitled " An act for the sale of swamp lands," the third section of which provides, that the proceeds arising from any sale or sales, shall be subject to the order of the county judge, for such purposes as the County Court may direct. Laws of 1859, page 201.

At the same session an act was passed, authorizing the board of supervisors of Whiteside county to apportion to each of the townships of that county, the school fund which accrued on the sale of certain swamp and overflowed lands therein, in such manner as the board of supervisors might deem expedient. Id. 189.

This is the substance of the legislation of this State in relation to the swamp lands. By the grant of those lands to the State, a fee simple estate passed, clogged by no condition. The State became the absolute owner of the lands, with power to dispose of them in such manner, and for such purposes, as to the State might seem most expedient. The language of the act is, in the first section, " shall be, and the same are hereby granted to the State." This is a full and perfect grant of an indefeasible estate. In the next section, a patent, to evidence the title, is required to be issued to the State, " and on that patent the fee simple to these lands shall vest in the State, subject to the disposal of the legislature of the State." Language cannot be used, to express more clearly, and in more comprehensive terms, the intention of the granting power as to these lands. They are granted unconditionally to the State, to be at the uncontrolled disposal of its legislature.

The proviso does not limit or qualify the power of the legislature over them, and their proceeds, in any manner. It is at the utmost, but the expression of a wish or a desire on the part of Congress, that the proceeds of their sale should be expended in levees and drains, with a view to their redemption. It is not a condition of the grant, that they shall be so expended, for a discretion is left with the legislature to expend them, " as far as necessary." From the act itself, no inference can be drawn that it was the desire of Congress to resume the grant, if the lands were not appropriated to their drainage.

The grant was a political measure, in which the States, having vast bodies of swamp and overflowed lands within their borders, unfit for cultivation, productive of disease, and yielding no revenues to the State, had a deep and important interest, whilst to the nation at large, the interest was comparatively trifling. Congress, in view of these facts, said to these States, these lands are of no use to the nation ; take them ; we make to you a perfect title to them; drain them and reclaim them if you can ; we commit them, and the whole subject, to your legislatures — adopt the policy we recommend,

but take the lands. But if the grant was made upon the trust that the proceeds of the lands should be expended in reclaiming them, where does the power reside to compel the legislature to execute the trust specifically ? If it is a trust, it is of municipal and not judicial concern, over which the power of the State is plenary and exclusive. The principle, we think, is the same as that established by the Supreme Court of the United States, in the case of *Cooper* v. *Roberts*, 18 How. 173, in relation to the sale of the school sections. In that case the court said, " the grant of those lands was to the State directly, without limitation of its power, though there is a sacred obligation imposed on its public faith. We think it was competent to Michigan to sell the school reservations without the consent of Congress." In this case, the sale was not for school purposes, but the proceeds went into the general fund. We can see no difference in the principle of that case, and of this. Here the grant is to the State directly of these lands, without any limitation of its power, and no application to Congress, or any other authority, is necessary to direct the appropriation of their proceeds.

On the acceptance of the grant by the State, the subject of draining and reclaiming the lands, and the proper "disposal" of them, became a question of State policy wholly to be determined by the legislature. At the outset, as we see by the act of June 22, 1852, the drainage policy was adopted, and all the necessary machinery set in motion to carry it out, to success. The views of the people changed as to this policy, and it was changed by the legislature, as is seen by the various acts of the legislature, to which we have referred, until, finally, by the act of 1859, the proceeds arising from the sale of these lands, are made subject to the order of the county judges of the several counties, for such purposes as the County Courts, respectively, may direct. Who shall question the power of the legislature thus to change its policy, in regard to these lands ? To what tribunal shall resort be had, to bring back the State to its original policy in regard to them, and where is the power lodged, to compel that body to repeal all the laws of 1859, and prior laws on this subject? It

is a political question in which the courts cannot interfere, and in their action upon it the legislature are responsible alone to their consciences and the public judgment.

What then, is the position of the complainant Bressler? for the rights claimed by the State's attorney, as the representative of the people of Whiteside county, are disposed of, by what we have already said.

Bressler claims to have purchased, on the second Monday of March, 1856, a large portion of these lands, at prices greatly exceeding their value, on which he has paid one-fourth of the purchase-money in cash, and has executed his several promissory notes for the remaining three-fourths, amounting to five thousand seven hundred and six dollars and four cents, payable in five years from date, with interest at six per cent. payable semi-annually in advance, and has also executed a mortgage on the lands, to secure the purchase-money. That he has paid interest on this balance to the amount of six hundred and eighty-four dollars and seventy-five cents, and avers, as to all this balance of purchase-money, he was always desirous to pay and discharge the same in labor to be done by him in draining and reclaiming the land, and in the construction of the necessary levees and drains as provided in the act of June 22, 1852; and he further alleges that the county has sold land the proceeds of which are sufficient to drain and reclaim all the lands granted to the county, and render them fit for occupation. He also alleges, that the county, by its board of supervisors, is about to distribute among the different townships in the county, the moneys arising from the sale of these lands, for school purposes. That suits have been commenced on some of the notes he executed; and prays for an injunction restraining their collection. He further prays, that the county be compelled to take its pay in labor in ditching the lands, and that they be enjoined from distributing the funds for school purposes, but to expend them in ditching and draining the lands. The court decreed all that was prayed, and annihilated all the legislation of the State on the subject of the swamp lands, except the act of June 22, 1852, which was to be carried into full effect by the county.

It certainly was the intention of the legislature, as we gather it from the various acts we have cited, especially that of February 14, 1859, which is very general in its terms, to remit to the several counties the exclusive control over these lands, and over their proceeds, and to release them from all the liabilities and obligations theretofore imposed upon them respecting them. That act releases to the fullest extent all the interest of the State in the lands, and all the machinery devised by the act of 1852, becomes so much useless lumber. Personal rights, however, acquired under that act, which had become perfect, are by no means disturbed. They remain in full force. The complainant Bressler has a clear title to the lands he purchased under the system devised by that act, and the county has a right to the money he contracted to pay for them. The contract, in this regard, is in full force and virtue.

The right he contends for, to pay for these lands in labor, never existed in him, under the act of 1852. All the right he had, was to become a bidder at the lettings of the work on the sections, and if he became the lowest bidder, and executed the required bond, that the work should be faithfully done, he could discharge his notes in such work. Buying the land, and executing notes and mortgage for the purchase-money, gave him no absolute right to a contract for work. The note was for the absolute payment of money. If the contract was, that it should be discharged in labor, why was it not so expressed in the note? Giving the note for the payment of money waived any right he might have had to do the work. But he had no such right only on the contingency that he should be the lowest bidder at the lettings of the work, and executed a satisfactory bond.

Suppose he had not been the lowest bidder at the lettings, was he not to pay his note? How else could the county procure means to pay those who performed the work except by collecting the notes given for the land?

No special contract is set up or shown by which these notes were to be paid in labor. They grew out of the system originally adopted by the State for the disposal of the swamp lands. For wise public reasons the system was abandoned,

and the proceeds diverted to other public objects. It is not for Bressler to complain, as he has the land he bargained for, with an unimpaired title. The appropriation of the proceeds is of no other concern to him, than as affecting the value of these lands, which possibly might have appreciated, had the system been fully carried out to completion. As he has stated his case, no relief can be furnished him in a court of equity. The power of the legislature being plenary and exclusive over the whole subject of these lands, they had the undoubted right to appropriate the proceeds, in such direction and for such purposes, as to them seemed most expedient. The demurrer to the bill, for the reasons given, should have been sustained.

The decree is reversed, and the bill dismissed.

*Decree reversed.*