## Albert Roeder et al., Appellants, v. John L. Pipe et al., Appellees.

### Gen. No. 7,755.

1. EQUITY—*when bill multifarious.* A bill seeking to recover damages for fraudulent sale of corporate stock and for rescission of the purchase of stock growing out of the organization, where the rights of complainants were not joint and some groups of defendants were held liable to some complainants and the same defendants, differently grouped with others, held liable to other complainants, was multifarious and the trial court could, with propriety, have dismissed the bill *sua sponte* on that ground.

2. EXECUTION OF INSTRUMENTS—*when genuine signatures to instrument impose no liability.* Although every signature to a document may be genuine, if those signing were not fully apprised of the nature of the instrument or did not knowingly sign it or if it was changed after signing, it does not express the signer's real intention nor involve liability.

3. EXECUTION OF INSTRUMENTS—*competency of internal evidence as to integrity of instrument.* Internal evidence of a paper in connection with extraneous evidence is competent and relevant in determining the genuineness and integrity of a document.

4. DURESS—*when subscriptions to corporate stock procured by oppressive moral coercion amounting to duress.* At a meeting to organize an insurance corporation, ·of persons who were elected directors, where part of the authorized stock had been subscribed and paid for and the promoter who was present stated that he had selected the persons present to be the directors and that it was necessary to have a formal subscription for all the stock to satisfy the insurance department, a statement by such promoter, who was insolvent, in answer to protests against his retaining all of the money derived from subscriptions above a certain amount that "I have the money and if you do not want to go on you can let it alone" was a threat amounting to moral coercion of those present into subscribing for the remaining stock.

5. CORPORATIONS—*when incorporators of proposed corporation not chargeable with fraud in procuring subscriptions.* Where knowledge of the appropriation of part of the money subscribed for corporation stock by the promoter as promotion fees was brought to the knowledge of the persons who were elected as directors at the meeting at which they were elected, which was ·after the stock had been subscribed and paid for by complainants

as well as by themselves, such appropriation was not on their part a fraud in the procuring of the subscriptions.

6. EVIDENCE—*when books of account incompetent to prove contents.* Where books of account were kept by the bookkeeper who knew nothing of the transactions entered but merely received items of debit and credit on slips of paper handed to her by her employer and entered them in the books by his direction, such books cannot be received as evidence of the facts they are offered to establish as against anyone but the party procuring them to be made, and then only as declarations against interest.

7. CORPORATIONS—*sufficiency of evidence to prove tortious conspiracy in incorporation.* To be sufficient to show that the directors elected upon organization of a corporation conspired with the promoter to defraud the subscribers for stock, the evidence must exclude every other inference.

8. EQUITY—*necessity for conformity of allegations and proofs.* Allegations and proofs must correspond in equity as well as in law.

9. CORPORATIONS—*when solicitation of stock subscriptions in corporate name not shown.* Where the solicitors for subscriptions to corporate stock signed receipts for payments by writing the name of the corporation followed by "salesman," followed by either no name or by the name of the salesman, or by the name of the salesman followed by "salesman" or "underwriter" there was no evidence of solicitorship of subscriptions in the company name sufficient to charge promoters or incorporators therewith.

10. EQUITY—*necessity of joint recovery against joint defendants in conformity with bill.* Where defendants in a suit in equity to recover damages for the fraudulent sale of corporate stock and for rescission of the purchase of stock are all charged jointly as promoters and tort-feasors, they must be found liable in manner and form as charged and if not liable as promoters cannot be made liable on some other ground not charged.

11. EQUITY—*necessity of recovery by all complainants suing jointly in equity.* The principle obtains in equity as to joint complainants, as to plaintiffs at law, that all must recover or none can.

12. SAVING QUESTIONS FOR REVIEW—*waiver of objections to findings and conclusions of master by failure to save exceptions to chancellor.* All findings or conclusions of fact presented by the master in chancery and not objected to before him and carried on exceptions to the chancellor are waived and not subject to further review.

13. REFERENCE—*when re-reference properly denied.* A petition filed by the solicitors for complainants asking the court to re-refer

the cause to the master and that they be allowed to file further objections was properly denied where the cause had been pending over two years and slight attention by counsel would have shown that the question sought to be raised was insisted on by defendants, nothing being concealed and the only reason given for a re-reference was the affidavit of one counsel for complainants that his failure to file objections at the proper time was due to an oversight and that the necessity for making the objections did not occur to him until he discovered a certain claim made by counsel for defendants.

14. APPEAL AND ERROR—*procedure to expunge scurrilous matter from briefs.* Remarks in the brief for appellees as to counsel's method of procuring cases are distasteful, out of place and repulsive to the courts but it would be a useless formality to order them stricken as being scurrilous, the proper proceeding being to strike the entire brief, leaving offending counsel with a hearing, or to continue the case for an inoffensive brief.

Appeal by plaintiffs from the Circuit Court of Adams county; the Hon. FRED G. WOLFE, Judge, presiding. Heard in this court at the April term, 1924. Affirmed. Opinion filed October 22, 1924.

ROLLA BABCOCK and WILLIAM SCHLAGENHAUF, for appellants.

WILSON & SCHMIEDESKAMP, R. M. WAGNER, PENICK & PENICK, JOHN E. WALL and JOHN T. INGHRAM, for appellees.

MR. JUSTICE CROW delivered the opinion of the court.

By this appeal it is sought to reverse a decree of the circuit court of Adams county dismissing the bill of appellants, seeking to recover from appellees damages for fraudulent sale of stock and for rescission of the purchase of stock growing out of the organization of the Mid-West Fire Insurance Company, a corporation. The original bill was filed May 15, 1922. After several demurrers had been sustained to the original and amended bills, the cause was tried on the sixth amended bill, answers and replications, on reference to a special master. The master found in favor of some complainants against some defendants.

He did not find in favor of all the complainants against all of the same defendants. In his report he found some complainants were not entitled to recover at all, and that some defendants were not liable to any of the complaints. There were numerous objections to the report which, being overruled, were ordered to stand as exceptions. The exceptions of complainants were overruled and those of defendants allowed by the court, and the bill dismissed for want of equity.

The amendments to the bill were numerous, often extensive and made by reference to page and line of the original and amended bills. This practice of amendment has often been condemned. The vice of such procedure is emphasized on appeal where pages, lines and words lose their identity on the printed page of the abstract and the typed page of the record. Appellants have inserted a printed bill at the end of the abstract which they say represents the correct state of the bill upon which the trial was had. We have carefully examined and compared it with the original and various amendments so far as we can correlate them, and are not satisfied it correctly represents the case as presented by the pleadings made during the progress of the trial and at the time of the exceptions. It is not a bill authenticated in the record. We have not, therefore, relied upon it but have endeavored to ascertain the state of the record when the cause went to the court upon the exceptions to the report of proofs and findings and recommendations of decree. This effort has been aggravated by the fact that the index to the abstract does not comply with rule 22 of this court. That rule requires all exhibits and documents to be indexed, described by their character, parties, date and number, so as to distinguish each from every other, and the page of the record where found, to be stated. Not one of them, though numerous and their importance manifest, has been indexed. The

record is in such confusion it has been difficult to find them. Extended exhibits have been inserted, not only out of the order in which they were probably introduced, but paged in the inverse order of the matter contained in them. Some exhibits are apparently in the record more than once.

Substantially the bill charges that in December, 1917, Frank H. Clark, John L. Pipe, Herman F. Jochem, J. H. VandenBoom, Jr., F. N. Carpenter, Philip J. O'Brien, Charles R. McNay, John S. Fraser, Louis C. Shriver, L. R. Hetherington, John T. Inghram, Elmer Lummis and John G. Thompson were promoters and organizers of Mid-West Fire Insurance Company, and were active in directing and bringing about the organization and its incorporation, and that William B. Powell and Charles Cottrell aided and assisted in the organization, as agents of the promoters; that they jointly solicited complainants as such agents to subscribe for stock; that said solicitations were made before the company was organized and while in the stage of promotion; that the company was incorporated October 4, 1919, and that Ireland, Pipe, Fraser, Hetherington, Inghram, Lummis, Shriver, Thompson and Frazier elected themselves directors, and served until it went into the hands of a receiver April 6, 1921, except Hetherington who died in October, 1920; that Powell and Cottrell were agents of the directors after the incorporation and received part of the fees for the sale of stock. The company was chartered January 28, 1918, it is averred, with a capital of $100,000, consisting of 10,000 shares of $10 each. That January 2, 1919, defendants Ireland, Lummis, Pipe, Inghram, Fraser, Frazier, Shriver and Thompson each subscribed for 1,111 shares of the capital stock and Hetherington subscribed for 1,112 shares at $14 per share, the aggregate subscriptions being $140,000. It is further averred the stock was sold at $20 per share and those

subscribing for all the shares at $14 paid for them out of the money received from complainants; that defendant promoters and their agents, and said directors and their agents, knew promoters' fees were being taken and that they failed to disclose that fact to complainants and each of them.

It is charged in the bill that many and different statements were made by the promoters and their agents and by the directors and their agents as inducement to complainants to purchase stock, which statements it is alleged were false and known at the time they were made to be false and that complainants did not know they were false. In other parts of the same paragraph of the bill it is averred such false statements were made without the party making them knowing or caring whether they were true or false.

As to the defendants Cottrell and Powell, the lastly amended tenth paragraph of the bill charges they received, through defendant promoters, fees which were retained out of complainants' several subscriptions, well knowing the secret retention of promoters' fees and commissions and failed to disclose the fact, and fraudulently concealed it from them and that they made the false representations alleged in the bill, "which said representations were either intentionally fraudulent or so grossly careless of the truth or falsity of the facts as amount in law to a knowledge of falsity and fraudulent character of the representations and ought to make them liable with other defendant promoters and directors, whether caused by actual or constructive fraud."

To this lastly amended bill answers were filed by all the defendants denying generally its averments, and that complainants were entitled to the relief sought; and averring that complainants were guilty of laches. Replications being filed, the cause was referred to a special master to take and report proofs and findings of fact, conclusions of law, and recom-

mend decree. Other averments of the bill will be noted hereafter.

A demurrer on the ground, among others, of multifariousness was interposed to the bill. It was overruled. It is now urged by appellees the bill is multifarious and for that reason, if no other, the decree should be affirmed. It does not appear that the chancellor dismissed it on that ground. But under the established practice he might with propriety do so *sua sponte*. Appellants contend it was not multifarious, because proceeding in the manner of the bill, a multiplicity of suits will be avoided. To this contention it may be replied: "A multifarious bill will not be allowed as a remedy, for a multiplicity of suits." 21 Corpus Juris, page 307, note 99. The whole doctrine of multifariousness is contained in one sentence by Lord Eldon, a master of equity pleading, quoted by Story on Equity Pleading, page 262, note 1 (10th Ed.): "Seeking to enforce different demands against persons liable respectively, but not as connected with each other, it (the bill) is clearly multifarious." *Gains v. Chew*, 2 How. (U. S.) 619, 11 L. Ed. 402 note. All that has been said on the subject is a commentary on and application of this principle, but it has never been improved upon. It is the touchstone by which all cases may be harmonized if decided in orthodox fashion.

The bill in the case now at bar, tested by it, is clearly multifarious. The demand jointly made by the bill is against several respectively, if some averments are true. It is a several demand under any averment. If it had been established that defendants were promoters acting in concert, all might have been jointly liable. But they could not be liable to the complainants jointly, for their interests were several—that is, "respective." Whether the alleged damage to complainants was the result of actual fraud and deceit, or of constructive fraud growing out of a fiduciary

relation, their rights were not common nor joint. The special master recognized this situation and found that each complainant was entitled to recover from certain groups of the defendants "jointly and severally." Some groups were held liable to some complainants and the same defendants, differently grouped, with others, held liable to other complainants. Nothing could more forcibly illustrate the propriety of the chancellor's action in exercising the power *sua sponte* to dismiss the bill to avoid the confusion if not impracticability of making a decree. This is a ground upon which the chancellor is authorized *sua sponte* to dismiss such a bill. *Gilmore v. Sapp*, 100 Ill. 297 (302); *Hollenbeck v. Cook*, 180 Ill. 65 (72). In this case, bill sought to contest a will and to have partition. The Supreme Court approved the action of the chancellor dismissing the bill *sua sponte* for multifariousness.

*North American Ins. Co. v. Yates*, 214 Ill. 272, is cited in support of resistance to the charge of multifariousness. The bill there filed was by the superintendent of insurance against several foreign insurance companies and their agents charging them with doing business in violation of the insurance laws of Illinois. There was one complainant representing the State against many, and all charged with the same illegal and unlawful acts in common. The joinder was not to seek separate relief against each but to prevent a continuance of a common wrong. The wrongs of defendants were not distinct and independent as here, requiring differing proof as to each, and hence it was held the bill was not multifarious. In *First Nat. Bank v. Starkey*, 268 Ill. 22 (26), the court say:

"By multifariousness, * * * is meant improperly joining in one bill distinct and independent matters and thereby confounding them. * * * Another test that is frequently applied is as to whether the causes of action united in the bill require separate briefs and decrees or separate defenses. Another test

often employed is whether the bill, fairly construed, shows a single object and seeks to enforce one common right. * * * It has been held that a bill which joined different claims against different defendants was multifarious, for a claim against two or more defendants cannot be properly united with a separate claim against one, only, and distinct claims against two or more defendants on individual accounts cannot be thus joined.''

If complainants with separate claims may not join against single defendants, or single complainants may not join in demands against many defendants severally, for a much stronger reason may many complainants not join in demands against many defendants under the facts averred in the bill and found by the master. *Imperial Fire Ins. Co. v. Gunning*, 81 Ill. 236; *Whiteside County Sup'rs v. State's Attorney*, 31 Ill. 68. None of the cases in Illinois cited by appellants support the proposition that a multifarious bill may be tolerated to avoid a multiplicity of suits; and none of them holds that a bill seeking relief as the one now before us was not multifarious. In *Weber v. Rupp*, Ill. App. *post*, decided at the present term of this court, we held a similar bill multifarious, upon the authorities there cited.

All persons signing defendants' exhibit 6 called ''Option Contract,'' except L. R. Hetherington who was dead at the time the bill was filed, were made parties defendant. It is averred against them they were promoters and organizers and were active in directing and bringing about the organization and incorporation of the company; and that Powell and Cottrell were agents of the promoters and as such solicited subscriptions to stock in the company; that the promoters and their agents solicited such subscriptions under the firm name and style of ''Mid-West Fire Insurance Company'' though it was not as a corporation then organized. This contract is important. Defendants deny they knowingly signed it. Some positively deny signing it. Complainants contend for it in connection

with other documents an authority that creates the obligation of defendants to pay damages they claim by reason of the purchase of stock from the signatories, and also from Cottrell and Powell, who sold stock, though signing none of the papers.

Hetherington had promoted in Quincy another corporation known as the Mid-West Live Stock Insurance Company. All those who it is claimed signed the exhibit were active in the Live Stock Company. Of that number, five had nothing to do with the organization of the Fire Company, unless this paper was part of activity in its promotion. Jochem, Helhake, Ogle, VandenBoom, Jr., Amen, O'Brien and McNay are those who had no connection with it.

The original document has been certified to us for inspection. It is entitled: "Contract for Sale of Stock. Mid-West Fire Insurance Company, Quincy, Illinois." It consists of two typewritten pages and purports to have been made and executed "by the petitioners, subscribers to the Articles of Incorporation of Mid-West Fire Insurance Company" December 22, 1917. By its terms the "Company does option and contract to sell" all of its authorized capital stock of $100,000 for the price of $14 per share "to the second party," the designation of Hetherington in the writing. It gives him authority to resell the same at a higher price than $14 per share, the increased price to be sufficient to pay the expenses of reselling, and a reasonable profit to the parties connected therewith; and such additional selling price as, added thereto, shall be the property of the second party or any person or persons working therewith, to be paid from the first money or securities collected thereon. Second party is given power and authority to appoint agents or to make underwriting contracts deemed advisable. In the fifth paragraph it is provided: "In the sale or resale of the stock of this company, any note or notes taken from the final purchaser thereof shall be ac-

cepted as being an original sale to the net amount due the company thereon from the second party, and shall be accepted by the company as such and the stock as subscribed for shall be held by the company as collateral to the full payment thereof."

The first page is in clear type and evidently a first carbon. The second is a carbon copy. Much of it is so obscure it is hardly legible. Many words have been changed, the changes extending almost to entire lines as well as to many successive lines. The changes are direct impressions of the type from the ribbon. Some words have been erased and new impressions imposed in their stead.

The concluding paragraph is: "This Contract agreed to and signed by the petitioners upon said articles of organization of the Mid-West Fire Insurance Company of Quincy, State of Illinois, and by the said second party on this 22nd day of December, A. D. 1917." In this paragraph the characters "22nd" and the year number are written with a black ink conspicuously different from that employed in signing the document. Not only are they in different ink but they are written with a different sort of pen, one with a broader point, if not a stub pen. It is extremely doubtful whether the last figure of the year number is a seven or an eight. The most satisfactory conclusion from a careful examination of it is that the figure 8 was first written and afterward changed to 7. The lower left curve of the figure 8 is plainly visible. The broad-pointed pen was used to trace and cover the curves of the 8. The horizontal line of the figure 7 is continued downward and crosses the vertical line of the figure. The word "December" in the first and final paragraphs was written by the same hand, with the same ink and the same pen. In the second line of the final paragraph, the words "of the Mid-West Fire" are written over other words as above described, and after the word "Fire" in the second

line, which is followed in the third line by the words "Insurance Company of Quincy, State of Illinois," is the word "stock" at the end of the second line dimly left after an attempt to erase it. Undoubtedly the words had been "Mid-West Live Stock Insurance Company."

This circumstance more particularly invites attention when it is considered in connection with the fact that the name of the Fire Insurance Company only appears on the first page in the manner heretofore indicated, and in the final paragraph on the second page as lastly described. The second page also has, as a title at the top, the words "Contract for Sale of Stock." In the process of ascertaining the integrity of the paper as distinguished from its genuineness, a natural and perplexing inquiry intrudes itself: Why was this title placed at the top of the second page in this unusual manner? Why were the dates changed? It was introduced by defendants for the purpose of rebutting the inference of fraud charged against them of which other related documents are charged to be the primary evidence. Although every signature may be genuine, if those signing were not fully apprised of the nature of the instrument or did not knowingly sign it, or if changed after signing, it does not express their real intention nor involve culpability. Internal evidence of the paper in connection with extraneous evidence is competent and relevant in determining inculpatory value of a document in civil as well as in criminal cases; in legal, as in moral responsibility.

In this connection the declaration and charter of the company, appearing in the record and introduced by the complainants, bear the names of the same persons, and purports to have been acknowledged before L. R. Hetherington as a notary public on the same day, December 22, 1917. The subscriptions to stock of the company by Hetherington, Inghram, Lummis,

Pipe, Ireland, Fraser, Frazier, Shriver and Thompson, as detailed hereafter at $14 per share, purports to have been made January 20, 1919. September 20, 1919, said parties signed an agreement to hold a stockholders' meeting October 4, 1919, for the purpose of completing the organization of the company. The minutes of the stockholders' meeting show it was held on that day and nine directors elected, being all of said subscribers. The date of the document is not conclusive as to the time of its execution and in this case does not express the actual time, as clearly shown by all the evidence.

From these documents it is contended the liability of all the defendants arises. But viewed standing alone, and in connection with parol evidence touching them, they present quite a different aspect. If the "option contract" was not knowingly signed and if the subscription to the stock by the nine subscribers was not in fact signed in January but was signed at the time of the organization, it is important to scrutinize the circumstances under which it was signed.

So far as the evidence discloses, only nine persons were present at the organization on the 4th of October. Only eight were present and testified at the hearing, Hetherington having died. These testify the subscription to the shares of stock at $14 per share was made the latter part of September or the first part of October, 1919. The record corroborates their version as to the time. That is the most probable date of the organization. No other date than October 4 is consistent with the entire record. But the circumstances under which it was signed is more important than the date. These circumstances are corroborated by and in turn characterize the conduct of the subscribers, who with others as their alleged agents are sought to be made liable to complainants.

The uncontradicted evidence of the surviving eight persons with regard to the subscription is that they,

with Hetherington, had met, pursuant to agreement, to organize the company. Hetherington reported he had sold all the stock and that subscribers were clamoring to have the company begin doing business; that he had collected $110,000 on the subscriptions and that $30,000 was outstanding that was good and would be collected. When this statement was made, some one said there should be $200,000 instead of $140,000. A discussion arose and after it had continued sometime Hetherington said he had an option contract to buy all the stock for $140,000. The contract was demanded and he produced the paper, now exhibit 6. Inghram read it aloud, including the names of all the signers. A great deal of discussion followed the reading. Hetherington then said he was the owner of the stock and entitled to it; that he had talked with the insurance department at Springfield and that they outlined the plan for operating the company and getting it under way; that the people to whom he had sold were clamoring for the company to begin business; that he had selected the nine then present to act as directors, and to get the company in shape to do business it was necessary to have a formal subscription for all the stock, so as to show the insurance department it was all subscribed. The evidence further shows Hetherington manifested impatience with the protest against his retaining all the money derived from subscriptions above $140,000; that he then said in substance, "I have the money and if you do not want to go on you can let it alone." It was then all except Hetherington subscribed for 1,111 shares and he for 1,112. Hetherington had the money—that of defendants as well as of all others subscribing who had paid. He was insolvent. The evidence shows all had subscribed at $20 per share. The threat was probably more than a veiled threat. They all understood it. It amounted to moral coercion as held by this court in *Rees v. Schmits*, 164 Ill. App. 250 (257-8 and cases cited).

It is true all the eight surviving subscribers testify they did not intend to pay for the 1,111 shares for which they then subscribed. But it was explained to them it was only a pro forma subscription list, all the stock, while subscribed, not having been paid for. They testify they paid Hetherington $20 per share for all the stock they had subscribed, as had every other subscriber. In this they are not contradicted.

This review of the evidence does not establish fraud or bad faith in manner and form as charged in the bill on the part of those who became directors of the company. Complainants' "exhibit C," the pro forma subscription list, is rendered innocuous in the light of defendants' "exhibit 6" when the manner of its procurement is considered. The latter exhibit bears on its face evidence of deception by Hetherington who was the promoter as the special master found. The evidence abundantly supports that finding. While executed nearly two years before the consummation of the scheme, it found a fit place in it. Its design was his and exactly fitted the emergency. No living person apparently knows of its preparation. With all other papers it was kept locked in Hetherington's safe. The second page shows, by the unsuccessful attempt to obliterate the word "stock" and the words "Mid-West Fire" immediately preceding it and written as above, it was part of another plan ingrafted on the one now engaging attention. That conclusion becomes more inevitable when considered along with the fact that several persons not connected with this were connected with that venture. More cogent still is the conviction when defendants' exhibits 31 and 32 are considered. Those exhibits relate to the organization of "Mid-West Live Stock Insurance Company, located at Quincy, Illinois." That charter, signed by the men signing the charter of the Fire Company and option contract, is dated December 22, 1917. It is also acknowledged before Hetherington as a notary.

The plans of the corporations are identical so far as varying kinds of insurance will permit. The certificate of the Director of Trade and Commerce as to filing the charter of the Fire Company, in possession of Hetherington, is dated January 28, 1918, and of the Live Stock Company, February 7, 1918.

In the sixth paragraph of the bill it is charged the nine subscribing for all the stock January 2, 1919, did so in furtherance of a scheme and plan to deceive and defraud complainants into subscribing for the stock; and to secure 30 per cent of complainants' subscriptions without their knowledge and consent fraudulently subscribed for the 10,000 shares of the stock of the corporation at $14 per share, and that they paid for same out of funds collected from complainants' subscriptions; that they fraudulently elected themselves directors and then issued certificates of stock to complainants at $20 per share, thereby retaining $6 per share out of their subscriptions for promoters' fees, not having disclosed the fact of such retention but fraudulently concealed it; that if they had known of such retention they would not have subscribed.

The special master found these averments as matters of fact proved. The court sustained exceptions to the finding. What was done on the occasion of the subscription by the nine had nothing to do with the matter of promoters' fees. If the misappropriation of $6 per share, or any other sum, as promoters' fees was accomplished by that proceeding, it was not a fraud in the procurement of the subscriptions. There is no evidence from which an inference can be drawn that any one, except Hetherington, knew of promoters' fees. The exhibit 6 of defendants, in connection with the evidence of all knowing anything of its execution, negatives the averment and the finding. All subscriptions of complainants had then been made. The money derived therefrom was in the hands of

Hetherington as all the evidence shows. The status of the subscribers as stockholders was fixed before that time. It is apparent, therefore, that when the subscriptions were solicited the solicitors were concealing from them nothing as charged in the bill. They knew nothing of it. Knowledge of the appropriation of money of the subscribers, including defendants, was brought to them then for the first time. How could they have disclosed it when taking subscriptions? They were equally impotent to conceal it, for concealment implies knowledge.

We have found no competent evidence as to money paid on stock subscriptions for promoters' fees to any one except Hetherington. It was sought at the hearing to prove by Hetherington's books, which he kept locked in the safe, that certain sums for subscriptions were collected and disbursements for commissions made. The manner in which the books were made up was such that they are wholly unreliable and incompetent for the purpose of establishing the facts by them sought to be established. The bookkeeper knew nothing of the transactions they were supposed to record. She made them up no doubt with the utmost fidelity from the information furnished by Hetherington. But the instruments of that information are wholly unreliable. He put items of debits and credits on slips of paper and handed them to her, and by his direction she put them in the book. Where did she get the items that were on the slips? We do not know from the evidence and she says she does not know. When were the entries on the slips made? As to some she says she does not know, and as to others she says he wrote them at the time he directed her to enter them. She knew nothing at the hearing of their whereabouts. No witness says they were true and correct. It is too elementary to require citation of authority, that books of account made in that manner and under such circumstances cannot be received

as evidence of the facts they are offered to establish as against anyone except the party procuring them to be made, and then only as declarations against interest. His verbal declaration to the bookkeeper would be quite as competent. They are worthless as instruments of judicial proof. Appellants say they are competent against all because they were made by a co-conspirator. This assumes the point to be proved. The evidence does not establish that defendants were conspiring with Hetherington. Evidence as to contemporaneous acts of the same sort and to the same end unexplained might justify the inference of intentional combination. But here the evidence fails to show such combination. To be sufficient for that purpose it must exclude every other inference than that sought to be established by it. The evidence in this record possesses no such probative value. *Trainor v. German-American Sav. Loan & Building Ass'n*, 204 Ill. 616 (620-1).

The special master misconceived the purpose and value of defendants' exhibit 6. In one paragraph of the report he finds the eight survivors who subscribed for the stock claim to have subscribed for the 10,000 shares with Hetherington October 4, 1919, on account of having signed the exhibit. The paragraph then consists of an argument upon facts proved or assumed, as to the consistency or inconsistency of their attitude with respect to the two documents. The inference drawn from the premises is, the nine ratified the invalid transaction, and he applies thereto the legal or equitable consequence of liability. The legal fallacy underlying this finding and application is, there is no such charge in the bill. If the bill had charged that defendants had no knowledge of that transaction because they were induced by the guile of Hetherington to sign it, but that when confronted with it, and the fact that they had unwittingly signed it was brought home to them, they then with full knowledge

of all the facts ratified and confirmed it, a different question might be presented and the finding would at least be responsive to the issue. The purpose of exhibit 6 being put in evidence by defendants was to meet the inference of fraudulent purpose and intent as to some of defendants that might without it be drawn from their having signed complainants' "exhibit C page 58" as it is described in the briefs. When exhibit 6 was in evidence and all the attendant circumstances of its execution were shown by internal and extrinsic evidence, no inference of bad faith could legally be imputed to them of soliciting subscribers for stock they had subscribed and paid for as theirs. There is, therefore, no inconsistency worthy of notice so far as the issues raised by the pleadings are involved. Instead of inconsistency, entire good faith of the deluded subscribers becomes apparent, leaving the promoter alone as the "master mind" of the whole business, the architect of this troublesome, expensive and unfortunate litigation.

The bill charges that Frank H. Clark, John L. Pipe, Herman F. Jochem, Thomas J. Frazier, Henry M. Ogle, J. W. Ireland, J. H. VandenBoom, Jr., F. N. Carpenter, Philip J. O'Brien, Charles R. McNay, John S. Fraser, Louis C. Shriver, L. R. Hetherington, John T. Inghram, Elmer Lummis and J. G. Thompson were promoters, organizers and active in directing and bringing about the organization and incorporation of the company; that Powell and Cottrell were agents of the promoters and solicited subscriptions to the stock and that defendant promoters and their agents solicited said subscriptions "under the name and style of Mid-West Fire Insurance Company." These averments were regarded as essential and therefore necessary to be proved at the hearing. The rule is as inflexible in equity as at law that the allegations and proofs must correspond. Every material averment in the bill must be sustained by the evidence,

or the case falls. *Sharkey v. Sisson,* 310 Ill. 98 (101-2), and cases cited.

The averment that the promoters and their agents solicited subscriptions "under the firm name and style of Mid-West Fire Insurance Company" finds no support in the evidence. Some of those signing receipts for payments for stock, as shown by the exhibits, signed "Mid-West Fire Insurance Company —salesman," and no name was signed as salesman. Some signed the company name as above, followed by their name as "salesman." Most of them signed the receipt with their name, followed by "salesman" under their signature. Hetherington signed as "salesman" and "underwriter." Generally he subscribed his letters relating to the corporation as "underwriter." Many, if not all receipts for payments in stock or money, he signed as "underwriter." Enough appears to disclose he was a professional promoter. He possessed, though but darkly perhaps, an idea of the underwriter. Exhibit 6 to him probably was an instrument of underwritership. But as to those placing the word "salesman" after or under the name of the company they meant only to express the idea they were Mid-West Fire Insurance Company stock salesmen. There is no evidence of firm-name solicitorship anywhere.

The defendants are charged jointly as promoters and tort-feasors. Therefore all must be found liable in manner and form as charged. If not liable as promoters, they cannot be made liable on some other ground not charged. The principle obtains in equity as to complainants, as to plaintiffs at law, that all must recover or none can. *Girard v. Lehigh Stone Co.,* 280 Ill. 479; 21 Corpus Juris, p. 307 *et seq.;* Id., p. 337, sec. 332. The special master found in the first paragraph of his findings that Hetherington was the promoter and employed agents to take subscriptions to the stock. He later finds that defendants Jochem,

Ogle, VandenBoom, J. O'Brien and McNay were not promoters—that is, "there is no evidence they were promoters" and that no relief could be had against them. He also finds that complainants Roeder, Loos, Randles, Shultz, Nash and Kollmeyer are not entitled to recover. There were objections by complainants to these last two findings which were overruled. The ruling in these respects was right. The evidence abundantly supports the findings of the master. There was no objection as to the first of the findings in that paragraph.

Under the equity practice, on reference to a master to take and report evidence and findings and conclusions and recommend decree, an opportunity must first be given the respective parties to challenge the findings and conclusions of the master. A tentative report is prepared and submitted to counsel to that end. If either is not satisfied with the findings of fact or with the conclusion of the master, an opportunity must be given him to correct the alleged error by pointing out specifically in writing the particular error in the finding or conclusion of fact. If after argument he concludes the objections are not well taken they are overruled. If he finds them valid he modifies the finding or conclusion. He then makes and files with them his supplemental report stating the disposition he has made of each objection. This brings the entire record before the court for adjudication upon all matters preserved by the objections, so far as exceptions to the rulings of the master thereon are preserved. The objections may by stipulation of counsel or order of court stand as exceptions, as in this case. The object of this procedure is to limit the scope of inquiry upon the record. It must be strictly complied with. All findings or conclusions of fact presented by the master and not objected to before him and carried on exceptions to the chancellor are waived and not the subject of further review.

When the special master found that Hetherington was the only promoter of the corporation, and that the others charged as being joint promoters with him were not promoters, if the complainants were not satisfied with it they should have objected and taken his ruling specifically thereon. They did not do so. They thereby acquiesced in it. After the report had been filed, solicitors for complainants filed a petition asking the court to re-refer the cause to the master and that they be allowed to file further objections. As ground for seeking the re-reference, one of counsel filed his affidavit stating the reason for failing to file the objections in proper time was "an oversight and that the necessity of making such objections did not occur to him until he discovered a claim would be made by defendants' counsel that L. R. Hetherington got the commission." The proposed objections were tendered with the application for leave to file them.

The assignment of error on the chancellor's ruling denying leave to re-refer and file additional objections cannot be sustained. The cause had been pending through several terms of court, extending over a period of two years. Slight attention to the objections by defendants to the report ought to have apprised counsel the question sought to be raised by the supplemental report were insisted on in the exceptions by different groups of defendants. Contention of counsel on those objections for defendants was prominent. Nothing was concealed. Throughout, it was urged Hetherington was the sole promoter and received all the money. It is almost everyday practice at trials to deny leave to open a cause for evidence or other purpose unless the party applying has been diligent to discover the necessity or has, without his fault, been misled concerning a material matter. It has not been usual, at least, to allow an application of this sort where no better reason is assigned than that the necessity for it was occasioned

by an "oversight," another name for want of dili-
gence. The chancellor was justified in his denial of
the application after an inspection of the record upon
the merits of the whole case, if for no other reason.
But counsel cannot with propriety complain if there
is an unreviewable finding in the record occasioned
by his negligence. It is significant that only one of
the solicitors made affidavit of surprise for the pur-
pose of the motion. We assume the other was not
surprised.

We have not undertaken to review all the findings
raised by the exceptions to the master's report. Many
of them are neither findings of material facts nor
conclusions therefrom. They abound with assertions,
as to what defendants "knew or ought to have
known." Many of such findings are nullities for they
do not follow from specific facts found. In the state
of the record the conclusion from all should have been
that the bill be dismissed for want of equity as the
chancellor rightly concluded in disposing of the ex-
ceptions.

A motion was filed in this court by counsel for ap-
pellants to strike certain matters from the brief for
appellees as scurrilous. The motion was taken with
the case. It would be a useless formality to order
them stricken. The proper procedure would be to
strike the entire brief, leaving the offending counsel
without a hearing, or continue the case for an inoffen-
sive brief. The remarks are improper, even if a true
expression of a fair deduction from the facts. We are
not concerned as reviewers of the record with coun-
sel's method of procuring cases. That is a matter
of sound professional practice, resting upon the high-
est principles of personal integrity and professional
morality. Remarks of the sort to which objections
are made, are very distasteful, out of place and re-
pulsive to all courts. They have not influenced this
court in the consideration of the case. We deem this

sufficient to be said, expecting there will be no repetition of the offense.

The decree of the circuit court is affirmed.

*Affirmed.*